[No. S134901. Apr. 12, 2007.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
JORGE JUNIOR VIDAL, Real Party in Interest.

1000

1002

COUNSEL

Phillip J. Cline, District Attorney, Carol B. Turner and Don H. Gallian, Assistant District Attorneys, and Barbara J. Greaver, Deputy District Attorney, for Petitioner.

Michael A. Ramos, District Attorney (San Bernardino), Mark Vos, Lead Deputy District Attorney, Mary L. Andonov, Deputy District Attorney; and David R. LaBahn for California District Attorneys Association as Amicus Curiae on behalf of Petitioner.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves,

Assistant Attorney General, Janet Neely, John G. McLean and George M. Hendrickson, Deputy Attorneys General, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Michael B. Sheltzer, Public Defender, Lisa Bertolino, Assistant Public Defender, Berry Robinson and William G. Mueting, Deputy Public Defenders, for Real Party in Interest.

John T. Philipsborn and Charles D. Weisselberg for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**WERDEGAR, J.**—The Eighth Amendment to the United States Constitution, prohibiting cruel and unusual punishments, bars the execution of mentally retarded persons for criminal offenses. (*Atkins v. Virginia* (2002) 536 U.S. 304, 321 [153 L.Ed.2d 335, 122 S.Ct. 2242] (*Atkins*).) California law, implementing the constitutional command of *Atkins*, provides a substantive standard and a set of procedures for determining, at the time of trial, whether a person against whom the prosecution seeks the death penalty is mentally retarded. (Pen. Code, § 1376.)[1] This case presents two issues relating to the prejudgment determination of mental retardation: (1) May the People obtain pretrial appellate review of a trial court's determination that the defendant is mentally retarded? (2) If such review is available, did the trial court here employ an incorrect legal standard in finding that defendant (real party in interest Jorge Junior Vidal) is mentally retarded?

On the question of reviewability, we conclude a pretrial finding of mental retardation is appealable under section 1238, subdivision (a)(8), as an order "terminating . . . any portion of the action . . . before the defendant has been placed in jeopardy." On the substantive question, we conclude the trial court did not use an incorrect legal standard in making the finding of retardation. That Vidal's "Full Scale Intelligence Quotient" on Wechsler IQ tests (Full Scale IQ) has generally been above the range considered to show mental retardation does not, as a matter of law, dictate a finding he is not mentally retarded. The legal definition of mental retardation for purposes of *Atkins*'s constitutional rule does not incorporate a fixed requirement of a particular test score. (§ 1376, subd. (a); see *In re Hawthorne* (2005) 35 Cal.4th 40, 48–49 [24

---

[1] All further unspecified statutory references are to the Penal Code.

Cal.Rptr.3d 189, 105 P.3d 552] (*Hawthorne*).) The trial court, therefore, did not commit legal error in giving less weight to Vidal's Full Scale IQ scores and greater weight to other evidence of significantly impaired intellectual functioning, including Verbal Intelligence Quotient scores on Wechsler IQ tests (Verbal IQ) in the mental retardation range.

FACTUAL AND PROCEDURAL BACKGROUND

Vidal is charged, along with other defendants, with the January 2001 killing of Eric Jones in Tulare County. The information alleges murder with special circumstances (§§ 187, 190.2), torture (§ 206), forcible sexual penetration (§ 289, subd. (a)(1)) and other crimes. Vidal pleaded not guilty to all counts and denied the special circumstance allegations. After the prosecutor announced his intent to seek the death penalty, Vidal moved under *Atkins*, *supra*, 536 U.S. 304, and section 1376 to preclude imposition of that sentence because of his mental retardation. Before a jury had been sworn or selected, the trial court held an evidentiary hearing on the question of retardation.[2]

At the evidentiary hearing, Vidal called two psychologists, Eugene Couture and Keith Widaman, who opined that he was mentally retarded. The People called one psychologist, Ronald McKinzey, who opined that Vidal was not retarded. A few lay witnesses testified to aspects of Vidal's observed behavior in his childhood home and in jail. The expert testimony encompassed the subject of "deficits in adaptive behavior," as well as "significantly subaverage general intellectual functioning" (§ 1376, subd. (a)),[3] but as the substantive issue under review here relates to the latter topic, we summarize only the evidence relating to intelligence.

Vidal, who was born in 1969, had received several IQ tests through the public school system. Couture tested Vidal's intelligence in 2003 and reviewed his results on earlier tests. The results of all the IQ tests are summarized in the following table, adapted from an exhibit prepared by Couture and introduced during his testimony (the range assignments are Couture's):

---

[2] Section 1376 provides, at the defendant's choice, for either a nonjury hearing on the issue before trial or a jury hearing after the guilt/special circumstance phase of trial. (*Id.*, subd. (b)(2).)

[3] Section 1376, subdivision (a) defines mental retardation as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18."

| TEST | DATE | SUBTEST | IQ SCORE | RANGE |
|---|---|---|---|---|
| Wechsler Intelligence Scale for Children, Revised (WISC-R) | 1980 | Verbal IQ | 59 | Mental Retardation |
| | | Performance IQ | 109 | Average |
| | | Full Scale IQ | 81 | Low Average/Borderline Mental Retardation |
| WISC-R | 1984 | Verbal IQ | 59 | Mental Retardation |
| | | Performance IQ | 126 | High Average |
| Wechsler Adult Intelligence Scale, Re-vised (WAIS-R) | 1987 | Verbal IQ | 77 | Mental Retardation |
| | | Performance IQ | 119 | High Average |
| | | Full Scale IQ | 92 | Average |
| WAIS-R | 2003 | Verbal IQ | 70 | Mental Retardation |
| | | Performance IQ | 96 | Average |
| | | Full Scale IQ | 78 | Borderline Mental Retardation |
| Wechsler Abbreviated Scale of Intelligence (WASI) | 2003 | Verbal IQ | 61 | Mental Retardation |
| | | Performance IQ | 99 | Average |
| | | Full Scale IQ | 77 | Borderline Mental Retardation |

Couture also administered to Vidal the Peabody Picture Vocabulary Test, which assesses the ability to understand spoken language. Vidal's scores (on both English and Spanish versions of the test) were in the lowest percentile of the population, as they had been on previous applications of the test in 1980 and 1989.

Couture and Widaman, the two defense psychologists, both testified that the large differentials between Vidal's Verbal IQ and Performance IQ scores were unusual and that in such a case the Full Scale IQ score (produced by a mathematical process from the two subtests) was not a fully reliable measure of general intelligence. According to a passage Couture quoted from the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (the DSM-IV-TR),

"[w]hen there is a marked discrepancy across verbal and performance scores, averaging across the two scores to obtain a full scale I.Q. score can be misleading."

Couture testified Vidal's low scores on the Verbal IQ tests indicate impairment in "verbal problem solving, comprehension and judgment, etc." His average Performance IQ scores indicate that his "skills of putting things together in a functional way in this case appear to be unimpaired. In other words, putting puzzles together and doing so quickly appears to be a functional skill. Understanding why one would do that or necessarily following verbal commands to do that, however, would not be available in this case." In this circumstance, the assessment of intelligence requires an exercise of clinical judgment, both as to "what you call the IQ and . . . what you do about it."

Couture believed that Verbal IQ tests measure "the skills that are . . . primary in getting along in life." Combined with Vidal's low scores on the Peabody Picture Vocabulary Test and his poor progress in school (Vidal's academic testing showed that except for some improvement in arithmetic, he never improved beyond the second or third grade level), Vidal's severe difficulty in processing verbal information demonstrated subaverage intellectual functioning originating in childhood.

Widaman, similarly, testified that the "crystallized" intelligence measured by Verbal IQ tests ("knowledge and procedures for working in [a] domain") is a "general area" of intelligence of particular importance to adjustment "in most areas of adult functioning." Widaman further opined that the Verbal IQ score is particularly important because "verbal facility is an important aspect of social interaction," without which a mentally retarded person may "tend not to be able to interpret the cues in these social situations well" and may be relatively gullible and "tend to go along with the group." Together with his historical and current impaired performance on the Peabody test and the borderline Full Scale IQ scores of 77 and 78 in 2003,[4] Vidal's low Verbal IQ

---

[4] An IQ score of 70, which is two standard deviations below the mean score of 100, is generally understood to lie at or near the border between low average intelligence and mild mental retardation. (See *Atkins, supra,* 536 U.S. at p. 309, fn. 5; *Hawthorne, supra,* 35 Cal.4th at p. 48.) According to the defense experts, however, two factors—measurement error and the Flynn effect—could together or separately result in a score as high as 78 from a mildly retarded person.

Every intelligence test has a standard error of measurement (SEM), a range lying around the tested score within which the true IQ is likely to lie. The 95 percent confidence interval around a measured IQ score is two SEM's. Widaman testified the SEM for the Full Scale IQ was approximately three points, and a text produced by the American Association on Mental Retardation, introduced at the hearing, refers generally to SEM's of "three to four points" on IQ tests. (Luckasson et al., Mental Retardation: Definition, Classification, and Systems of

scores justified a conclusion his intelligence in a "major area of functioning" is in the range of mental retardation.

McKinzey, the prosecution psychologist, disagreed. In his view, the Wechsler test's "best estimate of general intelligence, that is to say the overall intelligence, is [Full Scale IQ]." General intelligence "refers to a person's overall abilities, not some splinter skill . . . or one isolated weakness in intellectual abilities." McKinzey believed that Couture, by relying heavily on the Verbal IQ scores, "invites us to look at one weakness without understanding that there is a great and ameliorative strength." According to McKinzey, the DSM-IV-TR's statement that the Full Scale IQ could be misleading when there is a large discrepancy between Verbal IQ's and Performance IQ's, cited by Couture, "has never had the accuracy studied. It's been suggested. I certainly have seen plenty of folks suggest that. But we really don't know."

The trial court found Vidal met the statutory standard of "significantly subaverage general intellectual functioning." (§ 1376, subd. (a).) His "very low scores in terms of verbal I.Q.," even if due to a deficit in auditory processing rather than to low intellectual functioning "across the board," demonstrated a significant deficit in his "ability to process information and handle it adequately and to think logically." Moreover, the court found, his low test scores were not due to his speaking Spanish in the family home as a child, lack of diligence or early antisocial behavior, but to "something far deeper," "his severe lack of verbal ability." The court further observed that Verbal IQ was particularly relevant in applying *Atkins* because "[w]e are talking about issues of premeditation, deliberation, appreciation of concepts of wrongful conduct, ability to think and weigh reasons for and not for doing things and logic, foresight, and all of those are related to verbal I.Q." Accepting the existence of the Flynn effect (see fn. 4, *ante*), the court also noted that "one or two point" gaps between IQ scores and the theoretical cutoff were not persuasive. Finding Vidal also met the remainder of the statutory definition of mental retardation, the court ordered the prosecution precluded, under section 1376, from seeking the death penalty.

The People petitioned the Court of Appeal for a writ of mandate or prohibition and for a stay of the trial proceedings, contending the superior court "exceeded its jurisdiction by using the verbal IQ score coupled with the

Supports (10th ed. 2002) p. 57.) (The American Association on Mental Retardation recently changed its name to the American Association on Intellectual and Developmental Disabilities. We use the organization's name at the time of trial.)

The Flynn effect is the observed tendency of mean scores on a given IQ test to increase slowly over time. According to Widaman, mean scores tend to rise by about 3.3 points per decade, so that a test for which the original norm was 100 points will yield a mean score of 103.3 if given 10 years later. The WAIS-R, with which Vidal was tested in 2003, was first published in 1982.

defendant's adaptive behavior scores in lieu of the full scale IQ score as the basis for its decision that defendant is mentally retarded." In response, Vidal argued, inter alia, that the trial court's finding was not reviewable before trial because no appeal was provided for by section 1238. After ordering cause shown and receiving briefing, the Court of Appeal issued the requested writ.

The Court of Appeal rejected Vidal's argument against review, holding the superior court's finding was appealable under section 1238, subdivision (a)(8). On the substantive issue, the Court of Appeal, in a divided decision, agreed with the People's claim. According to the majority, "general intellectual functioning is primarily determined by the defendant's FSIQ [Full Scale IQ] score. It is this score which best represents the 'functional' or 'operational' IQ—the defendant's overall general intellectual functioning." The majority held the superior court "afforded insufficient significance to Vidal's pre-age-18 FSIQ score, inappropriately rejecting that score in favor of the VIQ [Verbal IQ] score as the measure of general intellectual functioning."

The dissenting justice observed that "[i]n this case . . . two experts testified that FSIQ was not the better measure, and they supported their opinions with facts and logic." In the dissenter's view, this testimony, together with Vidal's Verbal IQ scores in the mental retardation range and his poor learning performance as a child, constituted substantial evidence to support the superior court's finding of significantly substandard intelligence.

The majority responded that it was not purporting "to second-guess the trial court's factual determinations" but was instead holding that the trial court had made its finding using "the wrong legal standard." The Court of Appeal therefore mandated that the superior court vacate its order precluding the death penalty and reconsider the matter in light of the Court of Appeal's opinion. The court also continued in place a previously issued stay of trial proceedings.

We granted Vidal's petition for review and request for stay of trial.

DISCUSSION

I. *Appealability*

 As a general rule, the People may not seek an extraordinary writ in circumstances where the Legislature has not provided for an appeal. (*People v. Williams* (2005) 35 Cal.4th 817, 833–834 [28 Cal.Rptr.3d 29, 110 P.3d 1239]; *People v. Superior Court* (*Howard*) (1968) 69 Cal.2d 491, 499 [72 Cal.Rptr. 330, 446 P.2d 138].) Although the People sought relief in the Court of Appeal

by writ rather than appeal, therefore, the issue as framed in that court and in Vidal's petition to this court is one of appealability.

Section 1238 provides, in relevant part: "(a) An appeal may be taken by the people from any of the following: [¶] . . . [¶] (8) An order or judgment dismissing or otherwise terminating all or any portion of the action including such an order or judgment after a verdict or finding of guilty or an order or judgment entered before the defendant has been placed in jeopardy or where the defendant has waived jeopardy." The People contend, and the Court of Appeal held, that where first degree murder with special circumstances has been charged, a pretrial order under section 1376 precluding the prosecution from seeking the death penalty is an order "terminating," before the defendant has been placed in jeopardy, one "portion of the action" (§ 1238, subd. (a)(8))—to wit, the penalty phase portion.

■ While section 1238, subdivision (a)(8) does not expressly refer to an order terminating a "phase" of trial, its broad reference to "any portion of" an action can reasonably be read as including the penalty phase of a capital trial. This reading furthers the goal of the legislation adding "any portion of" to the statute (Stats. 1998, ch. 208, § 1), which was to provide a means for appellate correction of erroneous rulings even when those rulings do not entirely preclude prosecution. (See Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1850 (1997–1998 Reg. Sess.) as introduced Feb. 19, 1998, pp. 3–4; Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1850 (1997–1998 Reg. Sess.) as amended May 12, 1998, pp. 1–2.) The legislative history indicates the concern motivating the change arose primarily "[w]hen some, but less than all, criminal counts are dismissed prior to trial" (Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1850, *supra*, p. 3), but nothing in the history suggests an intent to exclude other partial terminations. The Legislature's choice of general language ("any portion of") suggests, to the contrary, that the intent was to include all partial terminations of an action.

That the Legislature did not expressly provide for an appeal in section 1376 does not necessarily reflect the intent to preclude appeal or review by writ petition. Having covered the subject of pretrial prosecution appeals by generally applicable provisions in section 1238, the Legislature would not be expected to put appeal provisions into each statute that concerns a pretrial motion. Thus, that section 1376 does not itself authorize (or prohibit) appellate review provides little, if any, clue as to whether section 1238, subdivision (a)(8) covers this situation. Allowing an appeal is consistent with the language of both statutes and would further the purpose of section 1238, subdivision (a)(8).

Against the conclusion that an appeal is permitted under section 1238, subdivision (a)(8), Vidal maintains, first, that because defendant's amenability to the death penalty is a "condition precedent" to holding a penalty trial, an order under section 1376 does not *terminate* the penalty phase. He appears to argue that a penalty phase that is "preclude[d]" (§ 1376, subd. (c)(1)) prior to trial due to the defendant's mental retardation can never legally begin and thus cannot be "terminat[ed]" within the meaning of section 1238, subdivision (a)(8). But the statute's language does not justify such a narrow reading. It expressly includes *pretrial* orders dismissing "or otherwise terminating" a portion of the action, suggesting that, as the term is used here, proceedings on a charge can be "terminat[ed]" before trial on it has begun. (§ 1238, subd. (a)(8).)

Second, Vidal compares mental retardation to minority at the time of the capital offense, also a categorical exclusion from the death penalty (§ 190.5, subd. (a); *Roper v. Simmons* (2005) 543 U.S. 551, 578 [161 L.Ed.2d 1, 125 S.Ct. 1183]), and observes that he has found no reported decisions that "allow prosecution appeal or review of a finding that the defendant is a minor." We need not decide here, of course, whether a pretrial ruling of minority under section 190.5 is appealable under subdivision (a)(8) or any other part of section 1238; suffice to say that if no reported cases have addressed such an appeal, it is most likely because the defendant's age is ordinarily established by undisputed documentary evidence and hence would rarely if ever be the subject of a contested hearing in the trial court.

Third, Vidal relies on our recent decision in *People v. Williams, supra,* 35 Cal.4th at pages 830–834, in which we held a magistrate's pretrial determination that a "wobbler" offense charged as a felony is to be treated as a misdemeanor (§ 17, subd. (b)(5)) was not appealable under subdivision (a)(1) or (a)(8) of section 1238. As we explained, however, the magistrate's order did not terminate or preclude the People from pursuing any part of the action, but only modified the charges: The order "did not preclude the People from prosecuting the wobbler offenses charged against defendant; it simply determined that these offenses were misdemeanors rather than felonies." (*Williams,* at p. 830.) In contrast, the superior court's order here precluded the People from pursuing a distinct portion of the action, the trial on penalty.

■ Finally, although not disputing the trial court's order was made before he was placed in jeopardy, Vidal contends the Court of Appeal's interpretation of section 1238, subdivision (a)(8), taken to its logical end point, would also allow the prosecution to appeal from a penalty jury's decision to recommend life imprisonment rather than death, a result that would assertedly create "constitutional complications." First, the Court of Appeal's holding does not imply that a jury's verdict of life imprisonment would, like the trial

court's pretrial ruling here, be deemed an order or judgment terminating the penalty phase for purposes of section 1238, subdivision (a)(8). Second, double jeopardy protections have (albeit in somewhat different circumstances) been held to apply to the capital defendant who obtains a verdict rejecting the death penalty. (See *People v. Henderson* (1963) 60 Cal.2d 482, 495–497 [35 Cal.Rptr. 77, 386 P.2d 677].) As section 1238, subdivision (a)(8) does not authorize an appeal once jeopardy has attached, except from orders after a guilty verdict or where jeopardy has been waived, the subdivision may be inapplicable to a prosecution appeal from a life without parole verdict on this ground as well.

We conclude the Court of Appeal correctly held the trial court's ruling precluding the death penalty is appealable under section 1238, subdivision (a)(8).[5]

## II. *Whether the Trial Court Used the Wrong Legal Standard*

Section 1376 provides the following substantive standard for determining mental retardation: "(a) As used in this section, 'mentally retarded' means the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." As we have previously noted (see *Hawthorne, supra,* 35 Cal.4th at pp. 47–48), the statutory standard is derived from, and is consistent with, widely used clinical standards cited by the United States Supreme Court in *Atkins.* (See *Atkins, supra,* 536 U.S. at p. 308, fn. 3.)

In finding Vidal to be mentally retarded, the superior court expressly found he satisfied the statutory requirement of "significantly subaverage general intellectual functioning." As to this intellectual-functioning prong of the definition, then, the court appears at least facially to have employed the correct standard. Nevertheless, the Court of Appeal held the superior court used the wrong legal standard by failing to give primary weight or consideration to Vidal's Full Scale IQ scores, which generally lay above the range

---

[5] In support of review by way of writ petition, the Court of Appeal held that appeal was an inadequate remedy in these circumstances because it would significantly delay trial. (Accord, *People v. Superior Court (Bolden)* (1989) 209 Cal.App.3d 1109, 1112 [257 Cal.Rptr. 678].) Although we ultimately conclude on the merits that the writ should not have issued on the grounds stated by the Court of Appeal, we agree that writs of mandate or prohibition may, where all the requirements for a writ are met (see Code Civ. Proc., §§ 1102, 1103; 6 Witkin, Cal. Criminal Law (3d ed. 2000) Criminal Writs, §§ 83–98, pp. 615–630), provide an appropriately speedy mode of review for pretrial rulings of mental retardation under section 1376. Whether review is by writ or appeal, Courts of Appeal should complete their review expeditiously to avoid unnecessarily delaying or disrupting the trial.

considered to show mental retardation. The People, similarly, urge us to hold as a matter of law that in applying section 1376 trial courts "should be limited in their use of IQ scores to the full scale IQ score, rather than have the discretion to substitute subtest scores which fail to provide a picture of general intellectual functioning." Here, the People argue, the trial court "relied too heavily on the petitioner's subtest IQ score and failed to give appropriate weight to his full scale IQ score."

■ We disagree that section 1376 dictates primary reliance on the Full Scale IQ score of a Wechsler intelligence test. The statute itself makes no reference to one or another clinical test of intelligence, any more than it refers to a particular score as the cutoff point for mental retardation. (See *Hawthorne, supra,* 35 Cal.4th at p. 48 ["unlike some states, the California Legislature has chosen not to include a numerical IQ score as part of the definition of 'mentally retarded' "].) As we further explained in *Hawthorne,* mental retardation, as a question of fact, "is not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the individual's overall capacity based on a consideration of all the relevant evidence." (*Id.* at p. 49.) To impose an absolute rule that a trial court's finding of mental retardation must be based primarily on Full Scale IQ scores would be to read into the statute a criterion the Legislature chose to omit and would be inconsistent with the principle that a factual finding of retardation must be based on all the relevant evidence. (See *People v. Stoll* (1989) 49 Cal.3d 1136, 1154 [265 Cal.Rptr. 111, 783 P.2d 698] ["No precise legal rules dictate the proper basis for an expert's journey into a patient's mind"].)[6]

In assessing the role the Full Scale IQ score (or any other single test score) plays in determining mental retardation, we must distinguish between rules of law and diagnostic criteria of psychology. The expert testimony below included a vigorous scientific debate as to whether Vidal's Full Scale IQ scores should rule out a diagnosis of mental retardation. While one psychologist, McKinzey, gave his opinion that Full Scale IQ scores are, in all circumstances, the "best measure of general intelligence," two other psychologists, Couture and Widaman, testified that where testing showed an extraordinarily wide divergence between Performance IQ and Verbal IQ scores,

---

[6] Because, as we held in *Hawthorne*, mental retardation is a question of fact (*Hawthorne, supra,* 35 Cal.4th at p. 49), we reject the People's suggestion that a trial court's finding on the issue should be reviewed *independently* on appeal as a mixed question of fact and constitutional law. Contrary to the People's argument, deciding as a matter of fact whether an individual is mentally retarded is not comparable to deciding whether a search was reasonable under the Fourth Amendment to the United States Constitution (see *People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]) or whether the prosecutor has deprived a criminal defendant of due process by suppressing favorable material evidence (see *People v. Salazar* (2005) 35 Cal.4th 1031, 1042 [29 Cal.Rptr.3d 16, 112 P.3d 14]).

the Full Scale measure was not a fully reliable measure. In support of their views, both sides gave scientific, not legal, reasons and cited scientific, not legal, authority.[7]

The Court of Appeal sided squarely with McKinzey in this debate over psychological standards, stating flatly that "general intellectual functioning is primarily determined by the defendant's FSIQ score." Like the psychologists who testified at the hearing, the lower court majority cited scientific sources (references published by the American Psychiatric Association and the American Association on Mental Retardation) rather than legal authority in support of its view.

█ The Court of Appeal majority erred in thus purporting to resolve a *factual* question—the best scientific measure of intellectual functioning—*as a matter of law*. In finding the facts of a particular case, courts and juries untrained in science are sometimes called upon to resolve contested scientific issues, but such factual findings do not establish generally applicable rules of law. The superior court here, for example, found on the basis of Couture's and Widaman's testimony that in Vidal's case his Full Scale IQ scores in the low average to average range did not preclude a finding of mental retardation. In a given case an appellate court might, within its proper role, hold that such a finding was not supported by substantial evidence in the hearing record.[8] But an appellate court cannot convert a disputed factual assertion into a rule of law simply by labeling it a "legal standard," as the Court of Appeal purported to do here.

█ Courts also must sometimes evaluate disputed scientific assertions in the course of determining the admissibility of expert scientific testimony. In determining the evidentiary reliability of a new scientific technique,

---

[7] Vidal has requested we take judicial notice of additional scientific publications not relied upon by the expert witnesses and not before the trial court at the time of its decision. We deny the requests on grounds of irrelevance. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

[8] We are not asked in this case to decide the substantial evidence question. The Court of Appeal denied it was granting writ relief because of an absence of substantial evidence, and the People do not contend in this court that they are entitled to relief on that basis. Because we do not address any question of substantial evidence, we also do not address Vidal's argument that a writ of mandate does not lie to correct ordinary, nonjurisdictional error in finding facts. (See *People v. Superior Court (Stanley)* (1979) 24 Cal.3d 622, 626 [156 Cal.Rptr. 626, 596 P.2d 691].) We also do not decide what role proof of the defendant's conduct in the charged offense properly plays in a pretrial hearing on mental retardation.

California courts look primarily to the technique's general acceptance in the relevant scientific community, an approach designed to ensure " 'that those most qualified to assess the general validity of a scientific method will have the determinative voice.' " (*People v. Kelly* (1976) 17 Cal.3d 24, 31 [130 Cal.Rptr. 144, 549 P.2d 1240], italics omitted.) Even under the arguably more searching federal court inquiry described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786], "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." (*Id.* at p. 595.) The courts' evidentiary gatekeeping function is thus not a warrant for judicial intervention in genuine scientific debates over substantive principles. In any event, we are not faced here with a question of admissibility of disputed evidence but with the question whether, when both sides of a scientific dispute have been presented by expert testimony, an appellate court may declare the debate's winner as a matter of law.

█ The Legislature has mandated that trial courts, in determining mental retardation for *Atkins* purposes (*Atkins*, *supra*, 536 U.S. 304), find whether the individual's "general intellectual functioning" is significantly impaired (§ 1376, subd. (a)), but has not defined that phrase or mandated primacy for any particular measure of intellectual functioning. The question of how best to measure intellectual functioning in a given case is thus one of fact to be resolved in each case on the evidence, not by appellate promulgation of a new legal rule.

## Conclusion

█ The Court of Appeal incorrectly granted writ relief on the ground that the trial court erred legally by failing to give primary consideration to Vidal's Full Scale IQ scores. We therefore reverse the lower appellate court's judgment. In light of the possibility that the People timely and properly presented the Court of Appeal with other grounds for relief the Court of Appeal has not already addressed, we remand the matter to that court for further proceedings. In deciding whether to seek additional briefing or address additional issues, the Court of Appeal should bear in mind the substantial delay of trial already incurred.

## DISPOSITION

The judgment of the Court of Appeal issuing a writ of mandate is reversed, and the cause is remanded to that court for proceedings consistent with this opinion. The stay of trial proceedings previously entered is continued pending action by the Court of Appeal.

George, C. J., Kennard, J., Chin, J., Moreno, J., Corrigan, J., and Johnson, J.,[*] concurred.

---

[*]Associate Justice, Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.