[No. H032068. Sixth Dist. Jan. 30, 2008.]

DeSHAWN LEE CAMPBELL, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## Counsel

Edward M. Sousa and Stuart D. Kirchick for Petitioner.

No Appearance for Respondent.

Dolores Carr, District Attorney, and Lane Liroff, Deputy District Attorney, for Real Party in Interest.

## Opinion

**BAMATTRE-MANOUKIAN, Acting P. J.**—DeShawn Lee Campbell, a defendant in a criminal proceeding pending in the superior court, is charged with murder in the first degree with special circumstances, making him eligible for the death penalty. (Pen. Code, § 190.2.)[1] He requested a pretrial mental retardation hearing pursuant to section 1376. Following the hearing, the trial court found that defendant "is NOT mentally retarded," thus permitting the prosecution to seek a sentence of death. (§ 1376, subd. (c)(2).) In a petition for writ of mandate and/or prohibition, defendant contends that the trial court's order is an abuse of discretion and creates a standard contrary to current professional standards. In a supplemental petition filed with leave of court, defendant contends that the trial court relied in part on false testimony presented at the mental retardation hearing.

We conclude that the hearing should be reopened for good cause in the furtherance of justice. (§ 1376, subd. (b)(2).) Accordingly, we will issue a peremptory writ in the first instance directing the trial court to vacate its order and to reopen the mental retardation hearing to determine if false testimony was presented at the original hearing. If the court determines that false testimony was presented, it shall strike that testimony and shall allow both parties to present additional evidence to support their positions regarding

---

[1] Further unspecified statutory references are to the Penal Code.

whether defendant is mentally retarded. The trial court retains discretion to determine the scope of the additional evidence it will allow to be presented. Also, the court may make other orders reasonably necessary to ensure the production of evidence sufficient to determine whether or not defendant is mentally retarded. (*Ibid.*) The court shall thereafter file a new order on "only the question of the defendant's mental retardation" (*ibid.*) that does not consider any false testimony but does consider all other evidence presented at the original and reopened hearings.

## FACTS AND PROCEDURAL HISTORY

Defendant is charged in count 1 of an information filed February 15, 2002, with the first degree murder of Jeffrey Fontana (§ 187), with special circumstances making defendant eligible for the death penalty: that the victim was a peace officer who was engaged in the performance of his duties (§ 190.2, subd. (a)(7)); that the murder was committed for the purpose of avoiding or preventing a lawful arrest (§ 190.2, subd. (a)(5)); and that defendant intentionally killed the victim by means of discharging a firearm from a motor vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)). Count 1 of the information further alleges that defendant personally and intentionally discharged a firearm from a motor vehicle during the commission of the offense (§§ 12022.53, subd. (d), 12022.55; see also § 189). On June 13, 2003, the trial court dismissed the use enhancement under section 12022.55, and the special circumstance under section 190.2, subdivision (a)(21).

On June 26, 2006, defendant filed a motion for a "mental retardation hearing" pursuant to *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242] (*Atkins*) and section 1376. Attached to the motion was the declaration of Dr. Dale Watson, a psychologist, stating that, in his opinion, defendant is mentally retarded.[2] (§ 1376, subd. (b)(1).)

The mental retardation hearing was held over 55 days between February 20, 2007, and July 17, 2007. Defendant called four expert witnesses: Dr. Watson, Dr. James Patton, Dr. Keith Widaman, and Dr. Pablo Stewart. These witnesses testified that they found defendant to be mentally retarded. The prosecutor presented two expert witnesses, Dr. William Lynch and Professor Karen Salekin. Neither of the prosecution's experts examined Campbell, so they could not offer a diagnosis, but they did not dispute that Campbell's intelligence test scores reflected that he had significant subaverage intellectual functioning. The prosecution's experts criticized the techniques used by defendant's experts and suggested that more or different tests should have

[2] On the court's own motion, the court takes judicial notice of its record in a prior writ proceeding in this matter, *Campbell v. Superior Court (People)* (Jan. 26, 2007, H030762).

been administered. A few lay witnesses, including some of defendant's family members and friends, testified as to aspects of Campbell's observed behavior prior to the age of 18.

Donald Connors, a lay witness who was presented by the prosecution, testified that in the 1990's he was a mentor to students in "Turning Point," a program for at-risk youth. He testified that he mentored defendant for one school year, attending one-on-one meetings with him as well as group meetings. He testified that, although he was supposed to meet with his student for an hour once a week, defendant did not regularly attend the meetings.

Connors further testified that the three goals defendant told Conners he wanted to accomplish were to make a rap CD (compact disc), to get a part-time job, and to complete school. He testified that he talked to defendant during their meetings about what defendant was doing to meet his goals. He testified that defendant was very committed to creating a rap CD and was doing things to make it happen. He testified that defendant was writing lyrics, volunteering at a recording studio in exchange for recording time, and working on the CD cover using a computer graphics program. Connors testified that defendant said that he had family connections that were going to help him with the distribution of the CD. Connors testified that defendant was also making steady progress toward graduation, but he could not recall whether defendant got a job. He testified that it was his impression that defendant had normal intelligence; he was able to understand what Connors was asking him and to express himself. Connors also testified that he was not aware that defendant was in special education classes at his high school.

On August 17, 2007, the trial court issued a 15-page order finding that Campbell is not mentally retarded. In relevant part, that order states:

"Penal Code Section 1376 . . . sets forth the substantive and procedural law for determining who is mentally retarded within the meaning of *Atkins*. Section 1376 defines 'Mentally Retarded' as 'the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18.' . . . The *Atkins* court, the California Supreme Court, and the experts in this case have been consistent in explaining that an I.Q. score under 70 generally satisfies the subaverage general intellectual functioning prong, and, deficits in adaptive behavior are demonstrated by limitations in at least two of ten skill areas or domains. Adaptive behaviors are those behaviors the individual uses in the community to get along—daily living skills. The ten skill areas (domains) are: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work.

"In this case there is no major dispute that Defendant's consistent I.Q. score[s] under 70 demonstrate subaverage general intellectual functioning. There is also no dispute that these scores, and the adaptive behavior examined, manifested before the age of 18. While there is no dispute as to two of the three elements (or criterion) of the mental retardation definition, the third area, adaptive behavior deficits, has been the focus of the extensive evidence and expert testimony presented at the hearing."

"It is . . . clear that we look to the Defendant's mental condition at the time of the crime and the time of the trial. While the definition of mental retardation requires that it be manifested before the age of 18, this is an aspect of the definition not the ultimate issue. The question this Court is considering and ruling upon is whether Defendant was mentally retarded at the time of the crime and/or at the present time. While there has been no claim or suggestion that Defendant's condition has significantly changed between the time of his youth and the present, it nevertheless is important to clearly identify and define the question under consideration." (Fn. omitted.)

"Pursuant to PC § 1376(b)(3) Defendant bore the burden of proving adaptive deficits and, as will be explained in detail below, Defendant failed to satisfy that burden."

"At the heart of this case is the fact that the ABAS-II,[3] a standardized instrument for examining adaptive deficits, was retrospectively administered to Defendant's father (hereinafter Mr. Campbell Sr.) and, accepting Mr. Campbell Sr.'s responses, Defendant rated adaptively deficient in seven of the ten skill areas/domains. . . . This single ABAS-II rating was a necessary component of every expert's diagnosis that Defendant was mentally retarded. Without the ABAS-II the doctors would not have made a mental retardation diagnosis. . . . Because of the fundamental importance of Mr. Campbell Sr.'s ABAS-II, and because this Court has no confidence in a diagnosis with only this single instrument playing such a key role, the Court is unable to accept the defense experts' diagnosis of mental retardation."

"In the original context of the ABAS-II there would be no reason to deliberately provide false information. However when the ABAS-II is used for the purposes of the present hearing, the 'best interests of the subject' are to be diagnosed as retarded because then the death penalty is unavailable. The motive of the reporter, certainly if they are a parent, would be to slant, shade, or exaggerate the responses so as to save the life of their son. Concerns regarding false reporting in an *Atkins* context must be deemed legitimate and

---

[3] ABAS-II stands for Adaptive Behavior Assessment System-Second Edition (ABAS-II).

acknowledged by the fact that a malingering test is given, as it was here, in conjunction with the I.Q. test. There is no comparable safeguard for the ABAS-II.

"This Court finds that Mr. Campbell Sr. has credibility issues which, combined with his motive and bias under the circumstances, render his ABAS-II reporting unreliable. Mr. Campbell Sr. has been shown to be inaccurate in answers on the ABAS-II and in specific testimony before this Court. Even without all the other problems with the ABAS-II, the fact that Mr. Campbell Sr. is the only reporter, on the only standardized instrument, would be enough alone to undermine the experts' reliance on the reported data. The defense experts suggest that the Court should accept their clinical judgment that Mr. Campbell Sr. is a satisfactory respondent on the ABAS-II. They state that they interviewed him and found him to be a reliable reporter because they found his information corroborated by others that they interviewed. Most, if not all, of those others were family members or friends of the Defendant and/or his family. These interviewees had much the same bias and motive for shading their information as Mr. Campbell Sr. did. Before rendering their diagnosis the experts spoke with no one who provided any divergent information or opinions on Defendant's adaptive behavior. This puts their clinical judgment under scrutiny by the Court."

"Because of the above difficulties, both in general and specific to this case, the other fatal flaw in the use of ABAS-II in this case is that there was only the single test and not at least two as the literature recommends. Given the preference for standardized instruments for a diagnosis, a single ABAS-II, by a biased reporter, is simply not enough for Defendant to carry his burden of proof.

"The ABAS-II, or any of the other standardized instruments, could and should have been given to another reporter. There exists a teacher version of the ABAS-II and suitable teacher(s) and/or a mentor were identified in this case. Also, other tests were identified . . . and there was not evidence that they would have had the same reporter limitations the ABAS-II did. The siblings and friends identified by Defendant might have been given a standardized instrument and although they would not have been as impartial and unbiased as the educational professionals, their answers, if consistent, would have provided what this Court finds to be necessary convergence on the standardized instruments.

"As an aside on this point, . . . this Court does feel an obligation to explain what sort of proof could have sufficed for the legal issue presented by PC § 1376. For purposes of this hearing Defendant only needed to show adaptive deficits in two of ten domains. While the ABAS-II requirement that the

reporter knows the subject across most domains makes sense considering the original purpose of the ABAS-II, such is unnecessary for an *Atkins* hearing. The ABAS-II domain sections appear severable and it seems logical to accept reporters in discrete domains if they have sufficient experience with the subject in the particular area. . . . Keeping in mind that a defendant need only to show deficiencies in two domains, a defendant should choose to focus on the several domains in which he has the strongest proof and present clear and concise evidence in those areas instead of the seemingly scattershot approach taken in this case."

"Without any reliable results from standardized instrument(s) the Court is left with selected anecdotal evidence which is insufficient to carry Defendant's burden of proof. . . . [¶] The central problem with such anecdotal evidence as we are left with was highlighted by the arguments that each side was screening or 'cherry picking' information favorable to their position. When examining the life of an individual with I.Q. scores in the mild mental retardation range there is going to be information going both ways. . . . For example, Defendant's school records have information to support both sides in this case."

"Some examples of seemingly divergent information in this case included the following: The direct testimony of Defendant's teacher, Ms. Cobbley, a person who knew him for a substantial period of time, in which she opined that although Defendant was a Special Ed. Student this placement was not due to mental retardation. . . . The fact that Defendant passed three of four High School proficiency tests. The focus and drive Defendant demonstrated associated with his desire to put together a rap CD which included computer skills and time working at a recording studio in exchange for recording time. Defendant's wherewithal to enter into an extracurricular contract for PE credits. Defendant's ability to obtain a driver's license, maintain a car, and successfully use it to get around the city. . . ."

"In conclusion, Defendant's proof fails because the single ABAS-II was insufficient and unreliable both in the abstract and as applied in this case. Without that standardized instrument the Court is left with the defense experts' deficient methodology, applied to anecdotal information which itself was sometimes unreliable or insufficiently developed. Because Defendant did not meet his burden of proof this Court hereby enters the finding that Defendant is NOT mentally retarded. (PC § 1376(c)(2).)"

On September 18, 2007, defendant filed a petition for writ of mandate and/or prohibition in this court contending that the trial court's order was an abuse of discretion. In the petition, defendant contends that the court (1) sets forth "a novel standard for gauging mental retardation" that is not supported

by current professional standards, (2) "speculates about possible testing or possible investigation done by neither side" rather than ordering that testing, and (3) misunderstands the three elements of the definition of mental retardation. Defendant requests that the court order a dismissal of the death penalty allegation, require a fair consideration of the evidence, or grant such other relief as is deemed just. On September 21, 2007, this court issued a temporary stay of defendant's criminal trial and requested preliminary opposition to the writ petition.

The People filed preliminary opposition on October 9, 2007, and defendant filed an informal reply on October 19, 2007. In the preliminary opposition, the People contend that the trial court's order was not an abuse of discretion as the court justifiably rejected the results of the ABAS-II and, aside from the ABAS-II, significant errors undermined the integrity of defendant's experts' investigation.

On October 24, 2007, defendant filed a motion in superior court to reopen the mental retardation hearing or, alternatively, for a new trial based on newly discovered evidence. In the motion, defendant alleged that "the prosecution presented the testimony of a witness who admits that his testimony was false and he failed to act on it when he realized his mistake because of reassurances from the District Attorney's investigator. Those reassurances were not a part of the recorded interview which was provided to the defense." The prosecutor submitted opposition and, on November 1, 2007, the trial court denied the motion, stating: "After the hearing and decision on the mental retardation issue Defendant filed a petition for a writ of mandate and the Sixth District issued a stay of proceedings in the trial court. Accordingly this Court is without jurisdiction to reopen, or grant a new trial, on the matter."

On November 7, 2007, defendant filed a motion for leave to file a supplemental petition for writ of mandate and/or prohibition. In the supplemental petition, defendant argues that lay witness Connors has repudiated his testimony at the mental retardation hearing, having signed a declaration stating that he confused defendant with another person named DeShawn. Attached as an exhibit to the supplemental petition was a copy of Connors's declaration, which states that he "erroneously gave detailed interviews about the wrong DeShawn. [¶] I had another mentee named DeShawn who was into RAP and not ever having been shown a photograph, I erroneously gave false information. [¶] . . . [¶] When I took the witness stand in the DeShawn Campbell matter I looked over at the defendant and realized it was the wrong young man. I did not know this young man and I was never his mentor and he was never my mentee. I wrongly identified DeShawn Campbell in court as having been my mentee. All the testimony I gave in court about DeShawn Campbell was false and I was mistaken. All my testimony related to the other

Deshawn and not DeShawn Campbell. [¶] All of my testimony regarding DeShawn Campbell having put together a RAP CD which included his computer skills and time working at a recording studio in exchange for recording time as well as all his goals was false and mistaken."

Also attached as an exhibit to the supplemental petition was a copy of an e-mail message reportedly from Connors to a defense investigator stating, "After further consideration, the statement that 'when I took the stand, I recognized that the Deshawn in the courtroom was not the one I testified about' is not true. I was not sure that it was the same person, but the doubt was not enough to cause me to change my testimony. As we discussed, I had been led to believe that there were other collaborative [sic] witnesses. I thought that if I was mistaken, then the other witnesses would have different recollections and the case would not rely on my testimony. As the case unfolded, this was not the case. [¶] What I didn't tell you was that after my testimony, I discussed Deshawn with another mentor who had very specific recollections of him, and it was at that time that I confirmed that I had testified about a different person. [¶] If I had realized in the courtroom that I had remembered a different person, I would have said so at the time. I did not knowingly commit perjury. [¶] I will be happy to sign another statement that reflects these facts."

On November 21, 2007, this court granted defendant leave to file the supplemental petition and issued a *Palma* notice,[4] advising the parties that this court was considering issuing a peremptory writ of mandate in the first instance and allowing a final opportunity to submit any opposition to the supplemented petition. The People filed opposition on November 29, 2007, and defendant filed a reply on December 14, 2007. In the opposition to the supplemented petition, the People contend that it is reasonably certain that defendant failed to carry his burden of proof, regardless of whether false evidence was introduced. The People further contend that, assuming arguendo that this court questions whether Connors's testimony was substantially material or probative to the trial court's decision, we should remand the matter to the trial court with directions for it to answer the following question: "Was the testimony of Donald Connors substantially material or probative to your decision within the meaning of Penal Code section 1473(b)(1) and as further defined in *In re Roberts* (2003) 29 Cal.4th 726, 748 [128 Cal.Rptr.2d 762, 60 P.3d 165]?"

---

[4] *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893].

## DISCUSSION

*Writ Review*

"[W]rits of mandate or prohibition may, where all the requirements for a writ are met [citations], provide an appropriately speedy mode of review for pretrial rulings of mental retardation under section 1376." (*People v. Superior Court (Vidal)* (2007) 40 Cal.4th 999, 1011, fn. 5 [56 Cal.Rptr.3d 851, 155 P.3d 259].) In reviewing a petition for writ of mandate and/or prohibition, we do not consider evidence that was not submitted to the trial court. (See Cal. Rules of Court, rule 8.490(c) [record supporting petition for writ of mandate or prohibition comprises documents and exhibits submitted to the trial court].) However, we may consider new evidence to the extent necessary to determine whether, in the interests of justice, further proceedings before the trial court are required on the issue previously submitted to it. (See Code Civ. Proc., § 909.)

In limited situations, an appellate court may issue a peremptory writ in the first instance, without issuance of an alternative writ or order to show cause, and without providing an opportunity for oral argument. (Code Civ. Proc., § 1088; *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1252–1253 [82 Cal.Rptr.2d 85, 970 P.2d 872] (*Lewis*).) "A court may issue a peremptory writ in the first instance ' "only when petitioner's entitlement to relief is so obvious that no purpose could reasonably be served by plenary consideration of the issue—for example, when such entitlement is conceded or when there has been clear error under well-settled principles of law and undisputed facts—or where there is an unusual urgency requiring acceleration of the normal process. . . ." [Citation.]' [Citation.]" (*Lewis, supra,* at p. 1241.)

Before issuing a peremptory writ in the first instance, we must comply with certain procedural requirements. Code of Civil Procedure section 1088 " ' "requires, at a minimum, that a peremptory writ of mandate or prohibition not issue in the first instance unless the parties adversely affected by the writ have received notice, from the petitioner or from the court, that the issuance of such a writ in the first instance is being sought or considered. In addition, an appellate court, absent exceptional circumstances, should not issue a peremptory writ in the first instance without having received, or solicited, opposition from the party or parties adversely affected . . . ." ' " (*Lewis, supra,* 19 Cal.4th at p. 1240.) We have complied with these requirements in the present case by providing notice that this court was considering issuance of a peremptory writ in the first instance and by requesting points and authorities in opposition to the supplemented petition.

*The Mental Retardation Hearing*

■ "In *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242], the United States Supreme Court held that execution of the mentally retarded violates the Eighth Amendment. But *Atkins* did not give a precise definition of mental retardation, and it left to the states the task of creating procedures to determine whether individuals facing execution are mentally retarded. (536 U.S. at p. 317.) ■ Thereafter, the California Legislature enacted section 1376, which establishes procedures for the determination of mental retardation in preconviction capital cases, and which defines mental retardation as 'the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18.' (*Id.*, subd. (a).)" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1428 [58 Cal.Rptr.3d 368, 157 P.3d 973]; see *In re Hawthorne* (2005) 35 Cal.4th 40, 43–44, 47 [24 Cal.Rptr.3d 189, 105 P.3d 552] (*Hawthorne*).)

The Legislature derived its definition of mental retardation from two clinical definitions referenced by the *Atkins* court, that of the American Association on Mental Retardation, and that of the American Psychiatric Association. (*Hawthorne, supra*, 35 Cal.4th at p. 47; *Atkins, supra*, 536 U.S. at p. 308, fn. 3.) "The American Psychiatric Association's definition is . . . : 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). . . .' [Citation.] 'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. [Citation.]" (*Atkins, supra*, at p. 308, fn. 3; see *Hawthorne, supra*, 35 Cal.4th at pp. 47–48.)

The American Association on Mental Retardation's definition is similar: " '*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' " (*Atkins, supra*, 536 U.S. at p. 308, fn. 3; see *Hawthorne, supra*, 35 Cal.4th at p. 47.)[5]

---

[5] The American Association on Mental Retardation is now known as the American Association on Intellectual and Developmental Disabilities. Its current definition of intellectual disability, which covers the same population of individuals previously eligible for a diagnosis of mental retardation, is as follows: "Intellectual disability is a disability characterized by

"Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus [that they should not be subject to execution]." (*Atkins, supra,* 536 U.S. at p. 317.) "It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. [Citation.]" (*Atkins, supra,* at p. 309, fn. 5; see *Hawthorne, supra,* 35 Cal.4th at p. 48.)

■ "[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reaction of others. . . . [T]here is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions but they do diminish their personal culpability." (*Atkins, supra,* 536 U.S. at p. 318, fns. omitted.)

■ "In death penalty cases, a defendant may seek a mental retardation hearing by an application supported by the declaration of a qualified expert that the defendant is mentally retarded, made a reasonable time prior to trial. Upon the receipt of the application, the trial court is to order a mental retardation hearing. The defendant may request a pretrial mental retardation hearing before the court. Such a request is deemed to be a waiver of the right to a jury trial on the issue. The pretrial hearing is then conducted prior to the selection of the jury. If the defendant does not request a pretrial court hearing, the issue is set for a hearing before a jury following the guilt phase of the trial. The jury that hears the mental retardation issue is the same jury that hears the guilt phase. (Pen. Code, § 1376, subd. (b)(1).)" (*Centeno v. Superior Court* (2004) 117 Cal.App.4th 30, 38 [11 Cal.Rptr.3d 533], fn. omitted; see also *Hawthorne, supra,* 35 Cal.4th at pp. 44–45.)

■ At the mental retardation hearing, the court "shall decide only the question of the defendant's mental retardation." (§ 1376, subd. (b)(2).) "The burden of proof shall be on the defense to prove by a preponderance of the evidence that the defendant is mentally retarded." (*Id.,* subd. (b)(3); see

significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before the age of 18."

*Hawthorne, supra,* 35 Cal.4th at pp. 45, 50.) The defendant first presents evidence in support of the claim that he or she is mentally retarded, the prosecution may present its evidence, and each party may present rebuttal evidence. (§ 1376, subd. (b)(2).) "The court, for good cause in furtherance of justice, may permit either party to reopen its case to present evidence in support of or opposition to the claim of retardation. Nothing in this section shall prohibit the court from making orders reasonably necessary to ensure the production of evidence sufficient to determine whether or not the defendant is mentally retarded, including, but not limited to, the appointment of, and examination of the defendant by, qualified experts." *(Ibid.)*

■ "[M]ental retardation is a question of fact. [Citations.] It is not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the individual's overall capacity based on a consideration of all the relevant evidence. [Citations.]" *(Hawthorne, supra,* 35 Cal.4th at p. 49; see *Vidal, supra,* 40 Cal.4th at p. 1012.) "The court 'shall not be bound by the opinion testimony of expert witnesses or by test results, but may weigh and consider all evidence bearing on the issue of mental retardation.' [Citations.]" *(Hawthorne, supra,* 35 Cal.4th at p. 50.) "The Legislature has mandated that trial courts, in determining mental retardation for *Atkins* purposes [citation], find whether the individual's 'general intellectual functioning' is significantly impaired (§ 1376, subd. (a)), but has not defined that phrase or mandated primacy for any particular measure of intellectual functioning. The question of how best to measure intellectual functioning in a given case is thus one of fact to be resolved in each case on the evidence . . . ." *(Vidal, supra,* 40 Cal.4th at p. 1014.)

■ "If the court finds that the defendant is mentally retarded, the court shall preclude the death penalty and the criminal trial thereafter shall proceed as in any other case in which a sentence of death is not sought by the prosecution. If the defendant is found guilty of murder in the first degree, with a finding that one or more of the special circumstances enumerated in Section 190.2 are true, the court shall sentence the defendant to confinement in the state prison for life without the possibility of parole." (§ 1376, subd. (c)(1).) "If the court finds that the defendant is not mentally retarded, the trial court shall proceed as in any other case in which a sentence of death is sought by the prosecution." *(Id.,* subd. (c)(2).)

In this case, the trial court found that there was no dispute that defendant has IQ scores below 70, consistent with a finding that he is mildly mentally retarded, and that these scores manifested before the age of 18. However, defendant also had the burden of proving by a preponderance of the evidence that he had deficits in adaptive behavior that also manifested before the age

of 18. Defendant attempted to do this, in part, by using a standardized test, the ABAS-II. This test was retrospectively given to his father in order to have his father evaluate whether defendant had significant limitations in at least two of the skill areas set forth in the American Psychiatric Association's definition of mental retardation that manifested before defendant reached 18 years of age. Defendant's father evaluated defendant as adaptively deficient in seven of the skill areas of which he felt he had significant knowledge, significantly more than the two skill areas required for a finding of mental retardation.

In opposition to defendant's claim that he is mentally retarded, the prosecution presented Donald Connors as one of its lay witnesses. Connors testified that he was a mentor to defendant for a year when defendant was a high school student and that defendant appeared to him to be of normal intelligence. Connors further testified that defendant wanted to make a rap CD and was working toward that goal by writing lyrics, working in a recording studio in exchange for recording time, and designing a CD cover using a computer graphics program. However, after the hearing and after the court filed its decision, Connors signed a declaration stating that defendant was not the student named DeShawn whom he had mentored and that all of his testimony was about a different DeShawn. Thus, Connors has asserted that his testimony presented at the mental retardation hearing was false testimony.

In its decision, the trial court pointed to Connors's testimony as an example of "divergent information" that was presented regarding defendant's mental retardation. There was other divergent information presented. For instance, as the court stated, defendant's school records have information to support both sides in this case. The court rejected defendant's father's testimony and rejected the expert witness testimony that relied upon it because the court found it to be biased, and found that defendant had not carried his burden of proof.

The court explained that defendant could have used a second standardized test or could have given the ABAS-II to other people who knew defendant before the age of 18, such as a teacher or his mentor. The court did not give this explanation until it filed its decision after the close of testimony and after argument by the parties. In addition, as stated above, Connors, who testified that he was defendant's mentor for one year when defendant was in high school, later asserted that his testimony was false. Section 1376, subdivision (b)(2), allows the court for good cause in furtherance of justice to permit a party to reopen its case in order to present further testimony in support of the party's position. The court may also order the appointment of, and examination of the defendant by, additional qualified experts. (*Ibid.*)

However, the court did not allow defendant to reopen the testimony in order to present any evidence regarding Connors's testimony, additional ABAS-II results, or the results of additional standardized tests as the court found it lacked jurisdiction to "reopen, or grant a new trial," due to this court's stay order.

 "Allowing false testimony to go unchallenged impairs the integrity of the factfinding objective of a trial (*United States v. Havens* [(1980)] 446 U.S. [620,] 627 [64 L.Ed.2d 559, 100 S.Ct. 1912]), because such testimony hinders or blocks the disclosure of the truth to the trier of fact (see *James v. Illinois* [(1990)] 493 U.S. [307,] 321 [107 L.Ed.2d 676, 110 S.Ct. 648])." (*People v. Pokovich* (2006) 39 Cal.4th 1240, 1250 [48 Cal.Rptr.3d 158, 141 P.3d 267].) A criminal judgment obtained through use of false evidence violates due process, whether the prosecution solicits the false evidence or simply allows it to go uncorrected when it appears. (*Napue v. Illinois* (1959) 360 U.S. 264, 269 [3 L.Ed.2d 1217, 79 S.Ct. 1173]; *Miller v. Pate* (1967) 386 U.S. 1, 7 [17 L.Ed.2d 690, 87 S.Ct. 785]; *People v. Marshall* (1996) 13 Cal.4th 799, 829–830 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) "Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted." (*People v. Seaton* (2001) 26 Cal.4th 598, 647 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

The People argue in their opposition to the supplemented writ petition that this court can conclude from the record and the trial court's order that, even if Connors's testimony was false, it was not "pivotal." However, in order to be granted relief, defendant need only show good cause to reopen the mental retardation hearing in the furtherance of justice. (§ 1376, subd. (b)(2).) Evidence was presented during the hearing to show that defendant had deficit adaptive behavior which manifested before the age of 18, and there was also evidence contradicting this evidence, including the testimony of Connors. We find that there is "good cause in furtherance of justice" (§ 1376, subd. (b)(2)) to reopen the mental retardation hearing to determine whether false testimony was presented at the original hearing. We need not determine whether or not any false testimony was "pivotal."

Accordingly, we will issue a peremptory writ of mandate in the first instance because there is clearly good cause to reopen the mental retardation hearing. At the reopened hearing, the trial court shall determine whether false testimony was presented at the original hearing. If the court determines that false testimony was presented, it shall strike that testimony and shall allow both parties to present additional evidence to support their positions regarding whether defendant is mentally retarded. The trial court retains the discretion

to determine the scope of the additional evidence it will allow to be presented. In addition, the court may make other orders reasonably necessary to ensure the production of evidence sufficient to determine whether or not defendant is mentally retarded. (§ 1376, subd. (b)(2).) The court shall thereafter issue a new order on "the question of the defendant's mental retardation" (§ 1376, subd. (b)(2)) that does not consider any false testimony but does consider all other evidence presented at the original and the reopened hearings.

For purposes of the reopened hearing, we observe that section 1376, subdivision (b)(2), states that the trial court "shall decide *only* the question of the defendant's mental retardation." (Italics added.) Unlike section 25, subdivision (b), which states that a defendant has the burden of proving insanity "at the time of the commission of the offense," section 1376 does not require a defendant to prove what his mental capacity was at the time of the commission of the offense. Rather, in order to prove that he is mentally retarded, defendant has "to prove by a preponderance of the evidence" (§ 1376, subd. (b)(3)), that he has "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior [which] manifested before the age of 18." (*Id.*, subd. (a).) Therefore, at the reopened hearing, both parties may present testimony or other evidence regarding their positions as to "the question of the defendant's mental retardation." (*Id.*, subd. (b)(2).) Also, the court may make other "orders reasonably necessary to ensure the production of evidence sufficient to determine whether or not the defendant is mentally retarded." (*Ibid.*)

## DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its August 17, 2007 order and its November 1, 2007 order, and to reopen the mental retardation hearing. At the reopened hearing, the court shall determine whether false testimony was presented at the original hearing. If it determines that false testimony was presented, it shall strike that testimony and shall allow both parties to present additional evidence to support their positions regarding whether defendant is mentally retarded. The trial court retains the discretion to determine the scope of the additional evidence it will allow to be presented. In addition, the court may make "orders reasonably necessary to ensure the production of evidence sufficient to determine whether or not the defendant is mentally retarded, including, but not limited to, the appointment of, and examination of the defendant by,

qualified experts." (§ 1376, subd. (b)(2).) The court shall thereafter file a new order on "only the question of the defendant's mental retardation" (*ibid.*) that does not consider any false testimony, but does consider all other evidence presented at the original and the reopened hearings. The temporary stay order is vacated. This opinion is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.264(b)(3).)

Mihara, J., and McAdams, J., concurred.

A petition for a rehearing was denied February 5, 2008, and the opinion was modified to read as printed above.