Filed 5/24/18

# IN THE SUPREME COURT OF CALIFORNIA

In re ROBERT LEWIS, JR.,       )

                             )         S117235

       on Habeas Corpus.      )

_____)

Petitioner Robert Lewis, Jr., seeks habeas corpus relief, urging that he is ineligible for execution because he is intellectually disabled[1] and that his counsel failed to investigate and present mitigating evidence as to penalty. We issued an order to show cause and subsequently ordered a reference hearing in the superior court. The referee found that (1) petitioner is intellectually disabled and (2) his trial counsel did not perform deficiently at the penalty phase.

The referee's findings regarding intellectual disability are supported by substantial evidence and are adopted. Because petitioner is entitled to relief from the death judgment under *Atkins v. Virginia* (2002) 536 U.S. 304, 321 (*Atkins*) and *In re Hawthorne* (2005) 35 Cal.4th 40 (*Hawthorne*), we need not reach the penalty phase ineffective assistance of counsel claims.

---

[1] The order to show cause used the term "mentally retarded," as does the referee's report in response. In accordance with current law and usage, this opinion uses the term "intellectually disabled" except when quoting or characterizing a source that uses the older term. (See, e.g., *People v. Boyce* (2014) 59 Cal.4th 672, 717, fn. 24; see also Stats. 2012, ch. 448 [revising various statutes to replace the term "mental retardation" with the term "intellectual disability"].)

# I. FACTUAL BACKGROUND

This evidentiary summary is drawn from the opinion in petitioner's first automatic appeal. (See *People v. Lewis* (1990) 50 Cal.3d 262, 271-274 (*Lewis I*).)

## A. Guilt Phase

In October 1983, victim Milton Estell had been trying to sell his car. He displayed it in a parking lot and ran a newspaper advertisement. On October 27, neighbors saw him standing outside his home, looking at the car and speaking with petitioner.

On October 28, after Estell's ex-wife, Jacqueline, had been unable to contact him and neighbors expressed concern, an officer went to Estell's home to check on him. He found Estell's body in a closet, bound and gagged. Estell had been stabbed repeatedly and shot in the back. Toilet paper had been stuffed in his mouth. His wallet lay nearby, containing credit cards but no cash. The car was missing.

There were no signs of forced entry. Petitioner's fingerprints were found in three locations in the house, including the bathroom near the toilet paper dispenser. Jacqueline confirmed a number of items were missing, including a gold chain. She identified a gold chain petitioner had worn during the preliminary hearing as the missing item.

On November 1, officers saw Estell's car parked on the street. Petitioner and a woman got in the car and drove off. The officers stopped the car, impounded it, and arrested petitioner. He was carrying $400 in cash and gave officers a false name. When interviewed, petitioner initially claimed he bought the car on October 24. He paid $11,000 in cash, which he had won in Las Vegas and carried in a brown paper bag. He said that the entire transaction took place on Estell's porch and that he never entered the house. He had Estell make out the bill

2

of sale to his girlfriend because he did not want the car in his name. Reinterviewed the next day, petitioner provided conflicting details. He said he had won $17,000 in Las Vegas and carried the money in a white bag. He maintained the sale took place on October 24, even when told neighbors had seen the car at Estell's on the 27th. A search of the impounded car revealed a bill of sale bearing Estell's forged signature. A door opener to Estell's garage was also recovered.

Petitioner's father testified for the defense that he had registered petitioner at a motel on October 24. The father entered the license plate number for Estell's car on the registration card. Petitioner's sister testified she had given him a gold chain that looked like the one he had worn at the preliminary hearing. Petitioner did not testify.

Petitioner was convicted of first degree murder and robbery. The jury found true allegations that he used a deadly weapon and a firearm, and the special circumstance of murder during the commission of robbery.

## B. Penalty Phase

At the penalty phase, the defense stipulated petitioner had been convicted of robbery in 1982, 1972, and twice in 1977. In mitigation, the defense presented evidence that petitioner's mother had died in 1967, his father had been sentenced to prison several times, and his brother was currently serving a prison term. His sister testified that she loved him and cared about "what happens to him." The jury returned a death verdict, which the court imposed.

## II. PROCEDURAL BACKGROUND

On direct appeal, we affirmed the judgment in all respects, but vacated the death sentence because the trial court erroneously considered a probation report in ruling on petitioner's application to modify the penalty. (*Lewis I, supra*, 50 Cal.3d

3

at pp. 286-287, 192; see Pen. Code, former § 190.4, subd. (e)[2].) On remand for the new modification hearing, the trial court denied the application to modify the penalty and reinstated the judgment of death. We affirmed. (See *People v. Lewis* (2004) 33 Cal.4th 214.)

When petitioner filed a habeas corpus petition, the Director of the Department of Corrections and Rehabilitation was ordered to show cause why relief should not be granted. After the respondent Attorney General's return and petitioner's reply, we ordered a reference hearing and directed the referee to address several questions. The first was whether petitioner is intellectually disabled within the meaning of *Atkins, supra,* 536 U.S. 304 and *Hawthorne, supra,* 35 Cal.4th 40. The remaining questions, each with several subparts, concerned the penalty phase ineffective assistance of counsel claims.[3]

---

[2] All further statutory references are to the Penal Code unless otherwise noted.

[3] The other questions were: What actions did petitioner's trial counsel take to investigate potential evidence that could have been presented in mitigation at the penalty phase of petitioner's trial? What were the results of that investigation? Was that investigation conducted in a manner to be expected of reasonably competent attorneys acting as diligent advocates? If not, in what respects was it inadequate? If trial counsel's investigation was inadequate, what additional information would an adequate investigation have disclosed? How credible was this evidence? What investigative steps would have led to this additional evidence? Did trial counsel's penalty phase investigation include investigation into petitioner's mental retardation and learning disabilities, the negative effects of petitioner's institutionalization, petitioner's family history, and his good character? What, if any, social history information did petitioner's trial counsel provide to defense psychiatrist Kaushal Sharma and defense psychologist Michael Maloney? When was that information provided? After conducting an adequate investigation of the circumstances in mitigation of penalty, would reasonably competent attorneys acting as diligent advocates have introduced evidence in mitigation at the penalty phase of trial? What rebuttal evidence reasonably would have been available to the prosecution?

Los Angeles County Superior Court Judge Robert J. Perry served as referee.[4]  Some 15 witnesses testified at the evidentiary hearing over the course of 14 days.  At least 12 witnesses were questioned about petitioner's intellectual functioning.  The referee filed a 42-page report with findings and recommendations.  Petitioner and the Attorney General filed exceptions to the report and provided supplemental briefing.

### III.  DISCUSSION

**A.  Legal Framework**

A habeas corpus petition is a collateral attack on a presumptively valid judgment, thus " 'the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them.' " (*In re Price* (2011) 51 Cal.4th 547, 559.)  The standard of proof is preponderance of evidence.  (*In re Cudjo* (1999) 20 Cal.4th 673, 687; see also *In re Bacigalupo* (2012) 55 Cal.4th 312, 333.) "Because the referee observes the demeanor of the witnesses as they testify, we generally defer to the referee's factual findings" and give them great weight if supported by substantial evidence.[5]  (*Bacigalupo*, at p. 333.)  These findings are

---

[4]     Judge Perry was appointed to the bench in January 1992.  As of the time his report, he had spent his entire judicial career hearing criminal matters and had presided over 29 death penalty cases involving 34 defendants, 12 of whom were sentenced to death.

[5]     Respondent argues that we should not afford the normal deference to the referee's findings because certain "intemperate comments" made during the evidentiary hearing "cast doubt on the referee's devotion to the process and the quality of its findings" and "suggested a predisposition toward the outcome of the question . . . in order to obviate what the referee saw as a waste of his time and judicial resources."  We disagree.  At the time of the report, the referee was an experienced jurist who had spent his entire career presiding over criminal matters, including 29 death penalty cases.  His report to this court was quite thorough, linked to the evidence presented, and explicit as to how he evaluated that evidence.  It is true that during the hearing the referee occasionally candidly

not binding, however.  Ultimately, this court must make the findings necessary to resolve petitioner's claim.  (*In re Thomas* (2006) 37 Cal.4th 1249, 1256–1257.)

Evaluation of intellectual disability involves examination of two primary factors:  1) significantly subaverage general intellectual functioning, and 2) deficits in adaptive behavior.  Both must manifest before age 18.  (See § 1376, subd. (a).)  In *Hawthorne* we recognized that " 'an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score' " for the intellectual functioning prong.  (*Hawthorne, supra*, 35 Cal.4th at p. 48.)  We declined, however, to adopt a fixed numerical cutoff, concluding that such a requirement would be "inconsistent with established clinical definitions" and undesirable in light of the imprecisions of IQ test scores, which have a five-point measurement error.  (*Ibid*.)  This approach remains sound.  (See *Hall v. Florida* (2014) __ U.S. __, __ [134 S.Ct. 1986, 2000–2001] (*Hall*).)  As to adaptive behavior deficits, *Hawthorne* quoted from *Atkins* and the clinical definitions from the American Association on Mental Retardation (AAMR)[6] and the American Psychiatric Association (APA). (*Hawthorne*, at pp. 47-48.)  The most current diagnostic guidance on adaptive behavior deficits is discussed *post* at pages 20-21.

The professional psychological community continues to refine its understanding of these concepts.  For our purposes here, intellectual disability is "a question of fact . . . 'not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the

---

acknowledged the difficulty of the task at hand and expressed rhetorical frustration at the process for retroactively determining a petitioner's intellectual disability. We are not persuaded, however, that his comprehensive findings should be disregarded either in whole or in part.

**6**    In 2007, the AAMR changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD).

individual's overall capacity based on a consideration of all the relevant evidence.' " (*People v. Superior Court* (*Vidal*) (2007) 40 Cal.4th 999, 1012; see *id.* at p. 1012, fn. 6.)

## B. Hearing Testimony and the Referee's Report

### 1. *The Expert Witnesses*

Natasha Khazanov, Ph.D., testified for petitioner.[7]  She had evaluated over 50 defendants for intellectual disability as a defense expert, determining that three of them suffered from that condition.  She examined petitioner three times at San Quentin State Prison and was the only testifying expert to have contact with him in the 24 years since his conviction.  Relying on her interactions with petitioner and other information in the case, Khazanov concluded that he is intellectually disabled.  With respect to risk factors, she noted petitioner's mother may have been intellectually disabled, drank heavily when pregnant with him, and struck him frequently.  Petitioner may have suffered from malnutrition and he fathered a son with Down syndrome.

Respondent called three experts.  Michael Maloney, Ph.D.,[8] had been consulted by the defense before trial in 1984.  Although Maloney had no

---

[7]     Khazanov earned a Ph.D. in clinical psychology from Bekhterev Psychoneurological Institute in Russia in 1988.  At the time of the hearing, she was an assistant clinical professor at the University of California, San Francisco and maintained a private practice.  She came to the United States in 1991 and obtained her license as a psychologist in 1996.

[8]     Maloney received his Ph.D. in clinical psychology from the University of Colorado in 1969.  At the time of the hearing, he was the mental health clinical district chief for the Los Angeles County Department of Mental Health and supervised mental health evaluations and services at the Los Angeles County jail. He had authored several books, including *Mental Retardation in Modern Society* and *Psychological Assessment: A Conceptual Approach*.  He was board certified in forensic psychology in 1988 and had assessed cognitive functioning in well over one thousand individuals.

independent recollection of petitioner, he testified based on his records and on his custom and practice in similar cases. Retained to administer tests and present a psychological profile, Maloney was asked specifically to determine if petitioner was legally sane and competent to stand trial. He met petitioner twice and had him tested by his registered psychological assistant, Nancy Kaser-Boyd, Ph.D.[9] Maloney reviewed case materials, met with counsel and participated in family interviews. He did not write a report because he believed his input would not assist petitioner's case.

Maloney testified he would have considered "significant" mental retardation a potentially mitigating factor. If petitioner had been "clearly mentally retarded," he would have informed defense counsel. Maloney had not considered petitioner mentally retarded by 1984 standards but emphasized that the question was not central to his inquiry into petitioner's potential mental illness or capacity to stand trial. Under current standards, Maloney considered the question of intellectual disability a "closer case." He could not say whether petitioner was so impaired.

Kaushal Sharma, M.D.,[10] also examined petitioner in 1984. He had no independent recollection of the case before reviewing his report. Defense counsel

---

[9] Kaser-Boyd has a Ph.D. in clinical psychology and completed a postdoctoral fellowship in forensic psychiatry at the University of Southern California Keck School of Medicine's Institute of Psychiatry and Law.

[10] Dr. Sharma has a medical degree from India and received psychiatric training in America and England. A forensic psychiatrist since 1977, he has been certified in forensic psychiatry by both the American Board of Psychiatry and Neurology (1994) and the American Board of Forensic Psychiatry (1981). At the time of the hearing he was well known and "very well regarded" by the referee, who considered him to be "superb" at analyzing persons on psychiatric and mental issues.

had asked him to determine whether petitioner was competent for trial and sane at the time of the offense. Dr. Sharma believed he followed his usual practice of interviewing the subject twice and reviewing documents. He administered no tests and could not recall if petitioner could read and write.

Dr. Sharma wrote a three-page report concluding petitioner was sane and competent. He found no indication of psychosis, organic brain disorder, depression or other major defect. He agreed with a previous diagnosis of antisocial personality disorder starting at an early age. It is likely he told counsel he could not assist the defense. He was not asked to evaluate intellectual disability and focused on mental illness and behavioral problems. He and Maloney often worked together. Dr. Sharma understood Maloney was evaluating petitioner's intellectual functioning and had "better tools" to make such an assessment.

Charles Hinkin, Ph.D.,[11] was respondent's principal expert witness. He never met with petitioner. He did review medical and legal records and watched Khazanov and Maloney testify. He acknowledged, "It's always better to examine a patient than to offer a diagnosis based on a review of medical records." Hinkin opined that petitioner is not intellectually disabled, although he is certainly a person with mental health issues and is functionally illiterate. Even as to the intellectual disability question, Hinkin admitted there is "room for honest . . . disagreement," and it is not "slam-dunk, clear-cut [and] incontrovertible one way

---

[11] Hinkin has a Ph.D. in clinical psychology from the University of Arizona. At the time of the hearing, he was the director of neuropsychological services at the West Los Angeles VA (Veterans Affairs) Medical Center and a professor in the department of psychiatry and biobehavioral sciences at the University of California, Los Angeles School of Medicine. He was board certified in clinical neuropsychology in 1997.

9

or the other." In Hinkin's view, the evidence of petitioner's adaptive behavior weighs disproportionately against a finding of intellectual disability.

2. *Intellectual Functioning*

The referee made the following findings with respect to petitioner's general intellectual functioning. Beginning at age six, petitioner was given multiple IQ tests: first by school authorities, then while in custody as a juvenile and young adult, later in 1984 in preparation for trial, and finally in 2003 in connection with this petition. The results are summarized below.[12]

| **Test** | **Date** | **Age** | **IQ Score** |
| --- | --- | --- | --- |
| Kuhlmann-Anderson Form A | 4/14/59 | 6 | 89 |
| Stanford Binet Form L | 11/20/59 | 7 | 83 |
| Lorge-Thorndike Form 1A | 1/8/60 | 7 | 78 |
| Kuhlmann-Anderson Form C | 1/8/62 | 9 | 82 |
| Lorge-Thorndike Form 3A-V | 5/16/63 | 10 | 57 |
| WISC | 5/21/63 | 10 | 70 |
| Revised Beta IQ | 8/68 | 16 | 83 |
| Thurstone Primary Mental Abilities SRA IQ (Thurstone Primary) | 9/3/68 | 16 | 67 (verbal) 99 (non-verbal) |
| Revised Beta IQ | 12/8/72 | 20 | 80 |
| Quick Test | 6/16/84 | 32 | 75 |

[12] The table in the referee's report erroneously identified the second test as the "Standard-Binet Form L"; its accurate designation is the Stanford-Binet Form L. Also, the referee's table erroneously listed the date for the Lorge-Thorndike Form 3 A-V test as "8/16/1963." School records reflect that it was administered on May 16, 1963, five days before the Wechsler Intelligence Scale for Children (WISC) and shortly before petitioner's eleventh birthday.

| | | | |
|---|---|---|---|
| Wechsler Adult Intelligence Scale - Revised (WAIS-R) | 7/5/84 | 32 | 72 (verbal) 76 (performance) 73 (full scale) |
| Wechsler Adult Intelligence Scale – III (WAIS-III) | 6/10/03 | 51 | 66 (verbal) 75 (performance) 67 (full scale) |

The referee noted the experts' agreement that such frequent testing in petitioner's youth "reflected an obvious concern by school authorities." Based on the early testing, Khazanov testified, "There was something fundamentally wrong with [petitioner] from [an] early age." Maloney opined petitioner "was probably singled out as being a kid who needed to be looked at and evaluated for some reason at that time." And Hinkin conceded that "something about this kid got the attention of the school teachers and authorities. They're not giving [IQ] tests [to] every single kid, you know, 6, 8, 10 times throughout their school [years]. . . . So there was something about him that made him stand out . . . ." However, the experts disagreed as to whether the test results showed subaverage intellectual functioning.

The referee found petitioner's WISC score of 70 in 1963 the most reliable assessment of petitioner's IQ before age 18, noting the Wechsler tests are the standard for assessing intellectual functioning (see, e.g., *Atkins, supra,* 536 U.S. at p. 309, fn. 5) and that the experts agreed the WISC was "the most reliable test." The referee found the other tests given to petitioner before age 18 were "of questionable reliability." For example, Maloney called the Stanford-Binet "the most biased" of the tests because it "was normed on white young people." Khazanov testified the Revised Beta IQ test is considered to have "low reliability" because of similar norming bias. Maloney opined group tests like the Kuhlman-

11

Anderson and the Lorge-Thorndike tests were used in the 1950's and 1960's but were "not good at all" in measuring IQ.

The person who administered the Thurstone Primary while petitioner was in the California Youth Authority described him as a "non-reading, non-bookish boy whose cultural set is so diverse from the major cultural patterns that he can not be adequately tested. His scores as listed are meaningless[,] for subject is not academic or vocationally oriented. He may be able to function as a dull normal, but that surmise is a projection based on the non-verbal SRA score . . . ." Maloney testified "dull normal" is usually above the cutoff for intellectual disability, but is "kind of like borderline."

The referee found petitioner's 1963 WISC score to be "remarkably consistent" with his later scores on the WAIS-R in 1984 and the WAIS-III in 2003. His scores on the WAIS-R and WAIS-III subtests were also "very similar," presenting "a consistent profile which appears to be reliable." The consistency in petitioner's Wechsler test scores over 41 years led the referee to reject respondent's argument that petitioner's WISC score reflected a lack of motivation or poor attitude toward school. The experts concluded, and the referee agreed, that petitioner was not malingering on any of the tests. The consistency of scores also led the referee to find that petitioner's WAIS-III score of 67 at age 51 was not caused by dementia.

Petitioner's Wechsler test scores are reflected below and include the WAIS-R as rescored by Khazanov. The referee found that the rescored WAIS-R scores "more accurately represent petitioner's intellectual functioning in 1984."[13]

---

[13]    Maloney's assistant administered the WAIS-R to petitioner in 1984. His original results were 72 (verbal), 76 (performance), and 73 (full scale). This scoring, however, did not include subtests for vocabulary and object assembly, and the subtest for information was incorrectly scored as a raw score of 5, instead of 4.

12

| Test | Date | Age | Verbal IQ | Performance IQ | Full Scale IQ |
|------|------|-----|-----------|----------------|---------------|
| WISC | 5/21/63 | 10 | | | 70 |
| WAIS-R | 7/5/84 | 32 | 72 | 76 | 73 |
| WAIS-R (rescored) | 7/5/84 | 32 | 68 | 76 | 71 |
| WAIS-III | 6/10/03 | 51 | 66 | 75 | 67 |

The experts opined on what effect, if any, socioeconomic factors played in petitioner's scores. Maloney testified that persons with petitioner's background "will always score low on these kind of tests, lower than probably their level of intelligence . . . [b]ecause he's got less than average level of education for sure" and experienced "a lot of disadvantageous factors," including being placed in custody at age 12. Hinkin explained the more a person diverges from the mainstream increases the chance that the person's score will differ from his actual level of intelligence. "There's [a] whole host of reasons why African-Americans have gotten the short end of the stick when it comes to educational opportunities, occupational opportunities, the kind of things that would . . . affect [IQ] test performance." Hinkin testified the "gap" in IQ performance between African-Americans and the mainstream is shrinking, "but it still remains to this day." Khazanov believed the WAIS-III is properly normed and reliable and that adjusting scores based on race or socioeconomic factors is inappropriate. She testified the most recent publication of the AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) (AAIDD-11) supports using standardized tests without adjustments based on race or

---

Khazanov rescored petitioner's WAIS-R, lowering the information subtest scaled score to 3 and inserting a vocabulary scaled score of 2 based on petitioner's WAIS-III vocabulary score. As rescored, petitioner's WAIS-R results were 68 (verbal), 76 (performance), and 71 (full scale).

socioeconomic status.  The referee declined to adjust petitioner's IQ scores, citing the difficulty in quantifying any adjustment and the AAIDD's pronouncement that these adjustments should not be made.

The referee concluded, "[P]etitioner meets the first prong of the mental retardation definition" in that he "clearly has significant subaverage general intellectual functioning which was manifested before age 18."  He found the consistency in petitioner's Wechsler tests scores particularly persuasive and noted all these scores "fall well within the cutoff score for mental retardation of 75."  The report noted even Hinkin conceded that "if you focus just on the better tests, which are the [Wechsler] tests, then . . . it would not be unreasonable to conclude that [petitioner's IQ scores] meet[] that [first] prong . . . ."

3.  *Adaptive Behavior*

Expert testimony differed as to petitioner's adaptive behavior.  Khazanov, petitioner's expert, found he "demonstrated severe deficits in the conceptual skills area[,] which in her view satisfied the adaptive behavior prong for mental retardation."  She described petitioner as "basically illiterate" and observed he was "the only person actually at San Quentin that I met who didn't know how to read and write."  Additionally, Khazanov found he "had serious difficulties in understanding spoken words and concepts and exhibited mental and cognitive deficits."  Khazanov found she had to repeat instructions for a test "many, many times" and that petitioner had "extreme difficulty understanding what I wanted from him."  Khazanov noted that past probation reports had observed that petitioner didn't "make sense."  Khazanov opined petitioner's inability to read and write is not the result of poor schooling.  She felt that "he attended school enough to be able to learn to read if he could."  Petitioner's lifelong friend, Larry Cleveland, attended school with petitioner and his sisters.  All of them learned to

14

read and write while petitioner did not. Khazanov considered this strong evidence of petitioner's adaptive behavior deficits.[14]

Khazanov did not interview or test third parties who had interacted with petitioner in his youth. Her tests and interviews of petitioner revealed such severe deficits in reading, writing, language, and money concepts that further steps were unnecessary to satisfy the adaptive behavior prong. Khazanov concluded petitioner was not malingering but instead was trying to please and favorably impress her. He also told her that he did not want her to find him "crazy." The referee found petitioner's resistance to this label "consistent with being mentally retarded."

Maloney's assistant, Nancy Kaser-Boyd, gave the WAIS-R test to petitioner in July 1984 when he was 32 years old. She noted he "might have a hearing prob[lem] — he seemed to *mishear* a number of questions." Maloney testified petitioner might have aphasia, "an expressive language difficulty," which "might be associated with mental retardation." Kaser-Boyd also noted petitioner's "talk comes out all confused" when dealing with the test section on comprehension. Petitioner had "real trouble disting[uishing] the concept" involved in the section on similarities. Maloney agreed that such a difficulty could indicate intellectual disability.

Testimony from childhood friends and family also pointed to adaptive deficits. Larry Cleveland testified petitioner could not read street signs or spell words. He was "slow" and did not learn how to shoot pool or gamble with dice as

---

[14] Khazanov also concluded petitioner suffers from lifelong brain damage. The Halstead-Reitan battery of tests showed he has severe difficulty discriminating between sounds. The tests showed he was "very severely impaired" in perceiving speech sounds, was very rigid, and could not learn new concepts. The referee found it "unnecessary to the finding of mental retardation to decide whether petitioner has brain damage."

well as Cleveland and others did. Steven Harris, also a childhood friend, could not remember petitioner ever reading anything. He did not think petitioner was "retarded," but petitioner was not as smart as Harris or Cleveland. "He just wasn't as quick as the rest of us." Tommie McGlothin, petitioner's first cousin, testified, "[S]omething [was] wrong with him. He had a problem." McGlothin said petitioner kept getting into trouble by "doing the same thing, going out and stealing bicycles."

Respondent's primary expert, Hinkin, acknowledged that "everybody agrees" petitioner is functionally illiterate and that the "reading and writing piece" of the adaptive deficit "is clearly there." He also agreed petitioner was not malingering. He questioned whether petitioner has brain damage in the absence of any neurological examination. He conceded, however, it was "quite possible that there is some sort of lateralized disease process that has been undetected through [petitioner's] 51-odd years of life." Hinkin further agreed that "we know something is wrong with" petitioner and that "there's a reason why he was sent to see the school psychologist" so many times. Even so, Hinkin felt the record was inadequate to satisfy the adaptive behavior prong.

Applying the AAIDD's current diagnostic definition (discussed *post,* at pp. 20-21), the referee found "[p]etitioner clearly exhibited significant adaptive behavior deficits before the age of 18." Friends and family considered him mentally "slow." To this day he remains unable to read and write or effectively understand and communicate. The referee rejected respondent's arguments "that petitioner was a successful street hustler and his ability to survive on the streets shows he did not suffer adaptive behavior deficits" and that "petitioner's interview by detectives on November 21, 1983 . . . shows that petitioner did not suffer communication difficulties." Instead, the referee noted, "An ability to survive on the street does not necessarily refute adaptive behavior deficits. The evidence

16

does not suggest that petitioner was a *successful* street hustler. He was arrested and convicted numerous times. His apparent failure to learn from his experience, provides additional support that he is intellectually disabled. Petitioner's interview by detectives similarly fails to provide persuasive evidence rebutting his weakened mental condition. In the interview, petitioner acknowledged being a 'pimp,' a 'gambler,' and a 'speed hustler' who had been 'hustling all [his] life,' but he also confidently denied his true identity and asserted he had never before been to prison. . . . Petitioner's adamant assertion of such easily disprovable lies, displays unclear thinking and an obvious lack of cunning. [Fns. omitted.]"

### 4. *The Referee's Conclusion*

The referee found petitioner is intellectually disabled within the meaning of *Atkins, supra,* 536 U.S. 304 and *Hawthorne, supra,* 35 Cal.4th 40. At the outset, he noted, "The difficulties in attempting to determine whether petitioner is mentally retarded are obvious. Mental retardation requires an assessment of intellectual functioning and adaptive behavior prior to the age of 18. Petitioner, who is now 59, committed the murder in this case in 1983 at age 31. The psychologist and psychiatrist who examined petitioner in 1984 were not focused on mental retardation because the *Atkins* decision exempting mentally retarded defendants from execution did not occur until 2002, more than 18 years later. To further complicate matters, the standard for mental retardation has changed over the years and is today more lenient than in 1983 and 1984."

As to subaverage intellectual functioning, the referee noted petitioner's difficulties in school; his repeat of first grade; the frequent IQ testing in his youth; and the consistency of the Wechsler test results, all of which fell within the intellectual disability range. Addressing adaptive behavior deficits, the referee cited petitioner's illiteracy, his difficulties with understanding, and the testimony

17

of his friends and cousin. The referee noted that petitioner's expert concluded that he is intellectually disabled, while "Maloney testified that under today's more lenient standards, this is a 'closer case,' and he cannot say whether petitioner is today mentally retarded." "Dr. Sharma did not assess petitioner for mental retardation, and relied on . . . Maloney to test petitioner's intellectual functioning." The referee considered it significant that respondent's primary expert, Hinkin, did not examine petitioner, yet acknowledged it is "always better to examine a patient than to offer a diagnosis based on review of medical records." The referee concluded Hinkin's testimony is entitled to lesser weight than that offered by the other experts.

## C.     Analysis

Our own review of the evidence demonstrates petitioner has met his burden of proving he is intellectually disabled. As noted, an intellectual disability assessment examines two related criteria, both of which are evident before age 18: (1) significantly subaverage general intellectual functioning, and (2) deficits in adaptive behavior. Substantial evidence demonstrates petitioner experienced deficient intellectual functioning before he turned 18. The reliable Wechsler scores all fall within the widely accepted range for intellectual disability. These scores remained consistent over decades. Both Khazanov and Maloney opined it would have been extremely difficult, if not impossible, for someone to falsely produce such similarities. Even Hinkin, respondent's primary expert, conceded that, based on these scores, "it would not be unreasonable to conclude that" petitioner satisfies the first prong.

Respondent challenges the referee's failure to consider other intelligence tests, his lack of motivation, and other socioeconomic factors. He urges that petitioner's scores underestimate his general intellectual functioning. He alleges

18

Khazanov had limited experience and ignored other possible explanations for petitioner's low scores. Yet there were sound reasons for the referee to credit Khazanov's testimony. She was the only testifying expert to interact with petitioner since 1984, which enabled her to assess petitioner's current functioning alongside his historical records. She could presently recall petitioner and his performance, unlike Maloney and Dr. Sharma. She specifically focused on the question of petitioner's intellectual disability, which Maloney and Dr. Sharma did not do when consulted by the defense. The consistency between petitioner's score on the WAIS-III (which Khazanov administered) and his earlier test scores supports the conclusion that petitioner's low IQ scores are the result of a long-standing intellectual disability, rather than a lack of motivation or dementia.

Additionally, the referee reasonably concluded that Dr. Hinkin's testimony was "entitled to lesser weight than that offered by the other experts." The referee was not bound by the opinion of any particular expert witness, but " 'may weigh and consider all evidence bearing on the issue of mental retardation.' " (*Hawthorne*, *supra*, 35 Cal.4th at p. 46.) Hinkin never met with petitioner personally, and he conceded it was better to examine a patient rather than offer a diagnosis based on a record review. The referee had discretion to weigh his testimony accordingly. (See *People v. Bassett* (1968) 69 Cal.2d 122, 146, fn. 22 [" 'the extent of an expert's knowledge goes to the weight of his testimony' "].) Hinkin himself acknowledged it would not be unreasonable to conclude petitioner's test scores meet the first prong, and Maloney agreed the question was a close one.

We further note that in *Moore v. Texas* (2017) __ U.S. __ [137 S.Ct. 1039] (*Moore*), the United States Supreme Court held that courts must "continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically

19

established range for intellectual-functioning deficits." (*Id.* at p. 1050.) Petitioner has two IQ scores that fall at or below 70 without adjustment for the standard error of measurement: his score of 70 on the WISC and his score of 67 on the WAIS-III. Petitioner also has a third score with the lower range falling at or below 70 when adjusted. His score of 73 on the WAIS-R yields a range of 68 to 78 or, if rescored as 71, produces a range of 66 to 76. *Moore* thus dictates that we must also consider petitioner's adaptive functioning.

On this topic, respondent complains the referee evaluated adaptive behavior according to "the most current authority on this subject" instead of the authority specifically endorsed by *Atkins* or *Hawthorne*. However, those cases do not preclude reliance on more current AAIDD criteria. The legal determination of intellectual disability is, of course, distinct from a medical diagnosis, but both our decisions and those of the United States Supreme Court contemplate that the determination must be an individualized one, informed by the views of medical experts. (See, e.g., *Moore, supra,* 137 S.Ct. at pp. 1051, 1053; *Hall, supra,* 134 S.Ct. at p. 2000; *Hawthorne, supra,* 35 Cal.4th at p. 49.) As such, the referee had discretion to consider current medical standards in assessing petitioner's adaptive behavior.

The AAIDD's diagnostic manual defines adaptive behavior as "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." (AAIDD-11, *supra*, p. 45.) Conceptual skills include language and literacy; concepts regarding money, time, and numbers; and self-direction. Social skills include interpersonal skills, social responsibility, self-esteem, gullibility, naïveté, problem solving, and the ability to follow rules and laws and to avoid victimization. Practical skills include personal

20

care, occupational skills, healthcare, travel and transportation, schedules and routine, safety, and use of money and the telephone.[15] (AAIDD-11, p. 44.) The description of adaptive functioning in the APA's Diagnostic and Statistical Manual V (5th ed. 2013) (DSM-5) is similar.

Substantial evidence shows petitioner had significant adaptive difficulties before age 18. Deficits included his functional illiteracy and poor progress in school. His friends and siblings grew up in similar circumstances and attended the same schools, yet appeared to function at a significantly higher level. These facts suggest petitioner was unable, as opposed to unmotivated, to learn. The evidence suggests petitioner may suffer from aphasia, a language difficulty that can be associated with intellectual disability. The professionals who tested petitioner as an adult documented difficulties in understanding and following directions. His verbal IQ scores indicate impairment in problem solving, comprehension, judgment, information processing, and logical thinking.

Respondent urges a focus on petitioner's adaptive strengths, including successful gambling in Las Vegas, supporting himself though illegal activities, maintenance of lasting relationships, and ability to banter with police when questioned. Respondent criticizes Khazanov's assessment as non-standardized and as failing to acknowledge petitioner's adaptive strengths or "street smarts." Respondent argues, "[A]n individual's strengths can cancel out the deficits in other areas." It is well settled, however, that adaptive strengths and weaknesses

---

[15] Significant limitations in adaptive behavior are found when an individual's adaptive performance falls two or more standards of deviation below the mean in either: (1) any of the three adaptive behavior domains (conceptual, social, and practical) or (2) an overall score on a standardized test measuring conceptual, social, and practical skills. (AAIDD-11, *supra*, p. 43.) Khazanov testified petitioner's deficits in conceptual skills are "very severe," "so apparent," and "significant" as to meet this prong without additional standardized testing.

can coexist with intellectual disability. (See *Brumfield v. Cain* (2015) 576 U.S. __ [135 S.Ct. 2269, 2281].) The United States Supreme Court has cautioned against overemphasizing perceived adaptive strengths to counter evidence of intellectual disability. The *Moore* court rejected the view that adaptive strengths constitute evidence adequate to overcome considerable objective evidence of adaptive deficits, noting the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*. The *Moore* court observed: " 'significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills.' " (*Moore, supra,* 137 S.Ct. at p. 1050; see also, AAIDD-11, *supra*, p. 47; DSM-5, *supra*, p. 33.) Moreover, as the referee noted, petitioner was not a successful street hustler, having been arrested and convicted numerous times, nor was he adept at deceiving police during his interview.

In sum, the referee's findings as to both intellectual functioning and adaptive behavior are substantially supported and we adopt them. Because he is intellectually disabled, petitioner is ineligible for execution.

## IV. DISPOSITION

The petition for a writ of habeas corpus is granted insofar as claim XVIII alleges that petitioner is ineligible for execution because he is intellectually disabled. The judgment in *People v. Robert Lewis, Jr.* (Super. Ct. Los Angeles County, 1984, No. A027897), is vacated to the extent it imposes a sentence of death.

In light of the above, we do not address the petition's allegations of ineffective assistance of counsel in claims XIV, XV, and XVI. The order to show cause on those claims is discharged.

22

The petition's remaining claims will be resolved by later order to be filed separately, as is our practice. (See *In re Scott* (2003) 29 Cal.4th 783, 829.)

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**CHAVEZ, J.***

_____

\*     Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Lewis
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S117235
**Date Filed:** May 24, 2018
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert J. Perry

_____

**Counsel:**

Robert M. Sanger, under appointment by the Supreme Court, for Petitioner Robert Lewis. Jr.

Bill Lockyer, Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Robert R. Anderson, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, John R. Gorey, Keith H. Borjon, Jamie L. Fuster and Margaret E. Maxwell, Deputy Attorneys General, for Respondent the People.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert M. Sanger
Sanger Swysen & Dunkle
125 East De La Guerra, Suite 102
Santa Barbara, CA  93101
(805) 962-4887

Margaret E. Maxwell
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2282