Filed 12/29/21  Sohmer v. Kerwin CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID SOHMER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SHAWN KERWIN et al.,<br><br>    Defendants and Respondents. | B309139<br><br>(Los Angeles County<br>Super. Ct. No. BC642263) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Affirmed.

Law Offices of David M. Wolf and David M. Wolf for Plaintiff and Appellant.

Eric D. Anderson Law and Eric D. Anderson for Defendants and Respondents Justin Urich and On The Thirty "2", Inc.

No appearance for Defendant and Respondent Shawn Kerwin.

_____

After the parties' business venture failed, plaintiff David Sohmer sued two of his co-investors, defendants Shawn Kerwin and Justin Urich, seeking the return of his investment in defendant restaurant, On The Thirty "2", Inc. (OTT2). Plaintiff's appeal from the defense judgment challenges the trial court's findings that he failed to prove that defendants violated the Corporate Securities Law of 1968 (Corp. Code,[1] § 25000 et seq.) by selling him OTT2 shares without "qualifying" or registering them, and that in any event, the sale of those shares was exempt from the qualification requirement pursuant to section 25102, subdivision (f). Plaintiff also asks us to rescind two agreements for failure of consideration. We conclude that the evidence supports the court's section 25102, subdivision (f) exemption finding, and we decline to address plaintiff's consideration argument, raised for the first time on appeal. Accordingly, we affirm the judgment.

## BACKGROUND

I.    The parties

Urich owned and operated a successful restaurant called On The Thirty, Inc. (OTT). Urich and Kerwin have been good friends for many years. Kerwin and Timothy Licata, aka Kirin Stone, were good friends and partners in the construction business. Kerwin introduced Licata to Urich more than 15 years ago.

Kerwin had been good friends with plaintiff's father for about 10 years when, in 2014, the father asked Kerwin to mentor his 22-year-old son during plaintiff's breaks from college in Paris.

---

[1] All further statutory references are to the Corporations Code, unless otherwise noted.

2

Kerwin agreed and he and plaintiff instantly became "great friends." Plaintiff was introduced to Urich. Kerwin and plaintiff met daily in a private dining room at the back of OTT, which they used as their office. OTT issued plaintiff two paychecks, although he did nothing in exchange for that money. Licata frequented OTT and became friendly with plaintiff.

II. OTT2

Urich and Kerwin wanted to open a second restaurant. Urich filed articles of incorporation for OTT2 in November 2014, authorizing the issuance of 10,000 shares of common stock. He and Kerwin prepared by-laws and issued the outstanding stock to themselves, knowing they could always increase the number of shares.

Once they started talking about OTT2, plaintiff stated he wanted to be part of opening a restaurant. Around mid-2015, Licata mentioned an Oak Park site for OTT2. The four viewed the property and agreed it would be a good location. Conversations about OTT2 became more earnest and the four began meeting at least every other day. As discussions progressed, plaintiff volunteered that he wanted to be a part of the deal and to participate in the business venture; no one told him there was an investment opportunity.

The parties entered into an oral agreement under which plaintiff would invest $100,000 in return for which OTT2 would issue him 10 percent of the stock and the parties would enter into a shareholders' agreement and elect a board of directors (the oral investment agreement).

No one asked, and plaintiff did not say, what he intended to do with his OTT2 stock, or whether he was purchasing it for his own account. Plaintiff did not tell Urich that he was investing in

3

OTT2 for someone else's benefit and gave Urich no reason to believe he was investing for anyone else. Plaintiff testified he invested because he was hoping to make some money and because it would be helpful for the corporation to have the cash.

Plaintiff is the beneficiary of a trust fund that was large enough to cover his $100,000 investment in OTT2 along with another $380,000 investment he made in a Palm Springs restaurant in 2016, which also did poorly and closed.[2] Plaintiff was often out of town, in New York or at college in Paris where he was studying for a degree in international business administration. When he was in Los Angeles, however, he and Urich frequently talked about opening OTT2.

Plaintiff paid his $100,000 investment in five installments: in July 2015; September 2015; October 2015, and then later. He made the first two installments before the parties executed the shareholders' agreement and before OTT2 issued stock certificates. After plaintiff made the second installment, the parties all felt that he was an owner, shareholder, and board member. Plaintiff knew he was an owner, director, and board member. Although he had the power, plaintiff never called a board meeting, even to demand the issuance of a stock certificate.

In the summer of 2015, the parties had a friendly and cooperative relationship. They had dinner and drinks together. They were like "schoolboys really excited to go out and have a great time and open up a restaurant. Everyone was in really great spirits in the beginning of July."

The parties executed the shareholders' agreement on September 30, 2015. The agreement recited that plaintiff, Urich,

---

[2] Plaintiff is not suing his business partner in the Palm Springs venture.

Kerwin, and Licata's construction company, Praxis Project Management, Inc. (Praxis), owned 10 percent, 35 percent, 35 percent, and 20 percent respectively, of OTT2's outstanding shares. The agreement did not state when stock certificates would issue. Urich never advertised or posted any announcement for the sale of OTT2 shares.

The parties' various relationships started falling apart during Praxis' delayed buildout of OTT2. There were staffing disagreements. Plaintiff discovered that he was not named on the liquor license, which was issued shortly before OTT2 opened. He was in Paris when Urich filed the license application and unavailable to submit his fingerprints for the live scan. Urich always intended to add plaintiff to the license once plaintiff returned to the area. Plaintiff became angry that he was not on the license. He had the chance to appear on the cover of a magazine as an owner of an Oak Park restaurant, but could not call himself an owner if he was not named on OTT2's liquor license or the Department of Alcoholic Beverage Control would revoke the license. Plaintiff retained counsel shortly after the restaurant opened for business.

OTT2 opened in February 2016, and ran as "a mom and pop business." Plaintiff admitted he did not work much at OTT2. He received one distribution of $4,000 from the restaurant.

Seven months after OTT2 opened, on September 30, 2016, its board of directors held a meeting and amended the articles of incorporation to increase the number of authorized shares from 10,000 to 50,000. The same day, OTT2 issued share certificate No. CS-004 showing that plaintiff owned 1,429 shares of OTT2 common stock. Plaintiff's attorney rejected the stock certificate. Until plaintiff hired counsel, having a stock certificate was not

5

important to him. The only document important for plaintiff was the shareholders' agreement because he wanted to be on the board of directors and protect his investment. Until he met with an attorney, the fact he did not have a stock certificate did not bother plaintiff. In Urich's view, plaintiff did not need to possess a stock certificate to be an owner. Plaintiff did not know whether he needed a stock certificate to be an owner.

OTT2 struggled financially. Upon learning that the restaurant owed back rent, plaintiff and Licata considered asking the landlord to change the locks so that they could take over the restaurant. OTT2 closed at the end of 2016, 10 months after opening, burdened with more than $100,000 in debts, and thousands of dollars that OTT had loaned it to keep it afloat. Plaintiff never attempted to sell or distribute his interest in OTT2.

## III. The lawsuit

After rejecting the stock certificate, plaintiff filed his complaint that did not name Licata or Praxis as defendants. Cast in five causes of action, the complaint sought (1) restitution and rescission, (2) fraud and punitive damages, (3) money had and received, (4) rescission and restitution for defendants' violation of the statutory qualification requirements to issue stock (§ 25503), and (5) to hold defendants jointly and severally liable for violating the statutory qualification requirements (§ 25504).

At the close of trial to the bench, the trial court issued a tentative statement of decision finding in favor of defendants. The court stated that "this case simply involves friends investing into a restaurant together and sharing ownership. The company was run more informally than formally, and plaintiff failed to

6

complain until he discovered that his name was not on the liquor license." Plaintiff filed objections. The court issued its final statement of decision modifying the earlier version without changing the result. Plaintiff timely appealed from the ensuing judgment.

## DISCUSSION

I. The sale of OTT2 securities was exempt from the qualification requirement.

Section 25110 prohibits the sale of securities in an issuer transaction unless the sale has been "qualified" according to state or federal statutory requirements, or unless the security or transaction is exempted from, or not subject to, qualification.[3] A defendant's lack of knowledge that qualification was required is not a defense to liability for the unlawful issuance or sale of securities. (57 Cal.Jur.3d (2021) Securities Regulations, § 134.) The prohibited act is the sale of securities that must be qualified, without having obtained the necessary qualification, irrespective of good faith. (*Ibid.*)

Focusing his appeal only on the securities qualification causes of action, plaintiff contends he proved that OTT2 violated section 25110 by issuing shares to him without qualifying them. He argues that defendants' responses to his requests for

___

[3] Section 25110 reads in pertinent part: "It is unlawful for any person to offer or sell in this state any security in an issuer transaction . . . whether or not by or through underwriters, unless such sale has been qualified under Section 25111, 25112 or 25113 . . . or unless such security or transaction is exempted or not subject to qualification under Chapter 1 (commencing with Section 25100) of this part."

7

admission (RFAs)[4] constitute conclusive concessions, with the result that the trial court erred in finding that plaintiff failed to establish every element of those causes of action. Assuming without deciding plaintiff is correct, the result here is the same as below because the evidence supports the court's additional finding that the transaction and shares were exempt from section 25110 qualification pursuant to section 25102, subdivision (f).

Exempted securities and transactions are addressed in sections 25100 through 25105. The burden of proving that a transaction is exempted is an affirmative defense that falls on the person claiming it. (§ 25163.)

At issue here is section 25102, subdivision (f)(1) to (4) which, in relevant part, exempts from section 25110 any "offer or sale of any security in a transaction . . . that meets each of the following criteria: [¶] (1) Sales of the security are not made to more than 35 persons . . . . [¶] (2) All purchasers . . . have a preexisting personal or business relationship with the offeror . . . . [¶] (3) *Each purchaser represents that the purchaser is purchasing for the purchaser's own account . . . and not with a view to or for sale in connection with any distribution of the security*. [¶] (4) The offer and sale of the security is not accomplished by the publication of any advertisement . . . . [¶]

---

[4] We deny Plaintiff's motion filed on February 22, 2021 to take additional evidence under Code of Civil Procedure section 909 because the evidence is neither relevant nor necessary. (*Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175, 180, fn. 3, disapproved on another ground in *DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1144; cf. *Campbell v. Superior Court* (2008) 159 Cal.App.4th 635, 647 [appellate court may consider new evidence to extent necessary].)

8

The failure to file the notice or the failure to file the notice within the time specified by the rule of the commissioner [of Business Oversight (§ 25005)] shall not affect the availability of the exemption." (Italics added.)

Preliminarily, plaintiff contends, as he argued to the trial court, that defendants forfeited this affirmative defense because they did not allege it in their answer and so he was not given notice. But defendants gave plaintiff actual notice in their answers to plaintiff's RFAs by denying that the stock was not exempt from qualification under section 25102. A denial puts the subject of the RFA at issue. (See *City of Glendale v. Marcus Cable Associates, LLC* (2015) 235 Cal.App.4th 344, 353 [admissions eliminate issues for trial].) Furthermore, both parties discussed the defense in their trial briefs, and defendants adduced evidence about the exemption defense at trial, without objection. The court then considered the defense, effectively exercising its considerable discretion to deem the answer amended to conform to proof, as defendants had suggested to the trial court. (Code Civ. Proc., § 473, subd. (a)(1); *Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1428.) Thus, defendants did not forfeit the affirmative defense and plaintiff had ample notice.

Turning to the evidence, plaintiff contends that defendants failed to prove subdivision (f)(3) of section 25102, italicized above. He does not dispute that the remaining elements of the exemption were satisfied. Specifically, plaintiff argues there is no evidence that he "represented" that he purchased the OTT2 shares for his "own account . . . and not with a view to or for sale in connection with any distribution of the security." (See § 25102, subd. (f)(3).)

9

The trial court found that plaintiff's "investment was personal, and not for the purpose of the sale or distribution of his interest to others"; plaintiff "did not invest for the purpose of selling his shares later"; and the "evidence showed that Plaintiff was not intending to sell or distribute his shares." Notwithstanding plaintiff's insistence to the contrary, we apply the substantial evidence standard of review to the trial court's factual findings. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) We consider the evidence in the light most favorable to the defendants as prevailing party, drawing all reasonable inferences in support of the factual findings, and liberally construing them to support the judgment. (*Ibid.*)

Applying this standard, we conclude that the evidence supports the trial court's factual findings. First, plaintiff, who was an owner of another restaurant, told Urich he wanted to be involved and to participate in the OTT2 business venture. He testified the shareholder's agreement was the only document he was interested in because it enabled him to be part of OTT2's management. He was, after all, studying business management. Second, plaintiff considered himself an owner of OTT2. He wanted to be on the cover of a magazine as the restaurant's owner, was angry that he was not on the liquor license, and contemplated changing OTT2's locks to take it over. These are the acts of someone planning to hold onto the stock, not to sell it. And plaintiff never represented otherwise. Indeed, he never demanded a share certificate until the business suffered losses and he retained counsel. Plaintiff testified that his lack of a certificate did not bother him. And, he never tried to sell his ownership interest, leading inexorably to the further inference that he never intended to transfer his shares. Therefore, the trial

10

court reasonably found from the testimony, and logically inferred from plaintiff's conduct, that plaintiff invested in OTT2 for his own account and not with a view to selling the shares to anyone else. (Evid. Code, § 600, subd. (b) ["inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action"]; *Pinto v. Farmers Insurance Exchange* (2021) 61 Cal.App.5th 676, 689 [inferences must be product of logic and reason and not speculation or conjecture].)

Plaintiff argues that according to *Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243, it is improper to draw inferences about his plans for the stock. Rather, plaintiff believes that for the exemption to apply, the record must contain an "affirmative" statement of intent under section 25102, subdivision (f)(3), whereas the testimony was about what he did *not* say: defendants admitted he made no written representations, and Urich testified that plaintiff did not state that he was investing for anyone else. However, *Apollo* is inapt. The questions there were whether the complaint stated causes of action for common law fraud and negligent misrepresentation (*Apollo*, at p. 243–244), *both of which torts require affirmative statements* (*id.* at p. 244)*,* and whether the defendant issuer violated section 25401 (*Apollo*, at p. 249), which prohibits *misrepresentations* in connection with the purchase or sale of securities (§ 25401), also requiring evidence of an affirmative statement. *Apollo* says nothing about the section 25102, subdivision (f) exemption or the type of evidence necessary for a court to make a finding under subdivision (f)(3). Otherwise plaintiff cites us to no authority on point. The trial court's

11

finding that plaintiff purchased the stock for his own account and not to sell it is amply supported by substantial evidence.

We reject plaintiff's contention, citing *People v. Corey* (1995) 35 Cal.App.4th 717, 729 (disapproved by *People v. Salas* (2006) 37 Cal.4th 967, 981 & fn. 7), that the trial court erred in basing its ruling on equity where a violation of the Corporate Securities Law of 1968 is a strict liability offense. A quick review of the statement of decision reveals that the court's equity reference is contained in the conclusion, after the court made its findings against plaintiff in connection with his causes of action under the Corporate Securities Law of 1968, and where some of the complaint's causes of action sounded in equity. In our view, the trial court understood this case correctly: the corporate formalities were not important or material to plaintiff until after the restaurant failed, no profits were to be had, and he had retained counsel. It seems plaintiff was in for the profit but not for the loss.[5]

II. We decline to address plaintiff's new theory, raised for the first time on appeal.

Plaintiff asks this court to rescind the oral investment and written shareholders' agreements for failure of consideration. (Civ. Code, § 1689, subd. (b)(4).) Plaintiff did not allege this theory in the complaint or raise it in the trial court and so he has forfeited it here. " 'It is the general rule that a party to an action may not, for the first time on appeal, change the theory of the cause of action.' " (*Krechuniak v. Noorzoy* (2017) 11 Cal.App.5th 713, 725.) Although we have discretion to address forfeited

---

[5] As the result of our holding here, we need not address the remainder of plaintiff's contentions.

12

arguments that raise pure questions of law on undisputed facts (*Key v. Tyler* (2019) 34 Cal.App.5th 505, 540), we decline to do so here. " '[F]airness is at the heart of a [forfeiture] claim. . . . [Citation.] In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack. [Citation.] Bait and switch *on appeal* not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier.' " (*Wittenberg v. Bornstein* (2020) 51 Cal.App.5th 556, 567, italics added; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 8:229.)

Moreover, plaintiff's new contention is meritless. His theory is that OTT2 *lacked the power* to issue any shares at the time the parties entered into the oral investment agreement to issue plaintiff 10 percent of the stock, because at that time, OTT2 had already issued all of its 10,000 shares to Kerwin and Urich. Thus, plaintiff reasons, we should rescind the oral investment and written shareholders' agreements for failure of consideration. However, corporations are empowered to issue their own shares. (See § 400; Cal.Civ.Prac. Business Litigation § 6:2.) As executed by the parties, the shareholders' agreement recited that plaintiff "owns 10 [percent] of the outstanding shares of Common Stock in the Corporation." Section 2.5(p) of the shareholders' agreement authorized the issuance of stock with board approval, and significantly, did not specify when the shares to plaintiff would issue. The articles of incorporation were amended on September 30, 2016 to increase the number of shares to 50,000, enough for OTT2 to issue plaintiff the stock certificate that he rejected. In short, plaintiff owned the stock by virtue of the

shareholders' agreement and his payment of consideration (see *Mitchell v. Beckman* (1883) 64 Cal. 117, 121; see also *Mindenberg v. Carmel Film Productions, Inc.* (1955) 132 Cal.App.2d 598, 608–609 [the issuance of certificates is not necessary to ownership]), and defendants performed their promise. Accordingly, there was no failure of consideration.

## DISPOSITION

The judgment is affirmed. Defendants are awarded their costs on appeal.

NOT TO BE PUBLISHED.


HILL, J.*

We concur:


LAVIN, Acting P. J.


EGERTON, J.

---

*\* Judge of the Santa Barbara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.*